1    UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF NORTH CAROLINA
2                 SOUTHERN DIVISION

3    UNITED STATES OF AMERICA,    :    Docket No. 7:12-CR-0020-BR-3

4         Plaintiff,              :    Wilmington, North Carolina
                                       Friday, February 3, 2012
5              v.                 :    9:40 a.m.

6    NEVINE ALY ELSHIEKH,         :

7         Defendant.              :

8    : : : : : : : : : : : : : : : : :

9
          TRANSCRIPT OF PRELIMINARY EXAM AND DETENTION HEARING
10           BEFORE THE HONORABLE ROBERT B. JONES, JR.,
                 UNITED STATES MAGISTRATE JUDGE
11

12   APPEARANCES:

13   For the United States       United States Attorney's Office
     of America:                 BY:  TIMOTHY M. SEVERO, AUSA
14                                     FRANK BRADSHER, AUSA
                                       ROBERT J. HIGDON, JR., AUSA
15                                310 New Bern Avenue, Suite 800
                                  Raleigh, North Carolina  27601
16
     For the Defendant:          Swift & McDonald
17                               BY:  CHARLES D. SWIFT, ESQ.
                                 1809 Seventh Avenue, Suite 1108
18                               Seattle, Washington  98101

19                               LINDA MORENO, ESQ.
                                 Post Office Box 10985
20                               Tampa, Florida  33679

21   Audio Operator:             COURT PERSONNEL

22   Transcript prepared by:     JANICE RUSSELL TRANSCRIPTS
                                 1133 Tanager Trail
23                               Virginia Beach, Virginia  23451
                                 (757) 422-9089
24
     Proceedings recorded by electronic sound recording; transcript
25   produced by transcription service.

1                              INDEX

2

3                              Direct   Cross   Redirect   Recross
   WITNESSES FOR THE
4     GOVERNMENT:
   Julia Hanish                   8       46

5

6

   WITNESSES FOR THE
7     DEFENSE:
   Dr. Aly Elshiekh               71      75       78         80

8

9

   EXHIBITS:                              Marked      Received

10

      D-1   Elshiekh's resumé              65          65

11

      D-2   Character letters              65          66

12

   ARGUMENT:       Mr. Swift                                      81

13

                   Mr. Severo                                 86, 94

14

   RESPONSE        Mr. Swift                                      91

15

16 THE COURT:      Finding                                        95

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2         (Call to Order of the Court)

3              THE COURT:  Good morning.

4              MS. MORENO:  Good morning.

5              MR. SEVERO:  Good morning, Your Honor.

6              THE COURT:  Ladies and gentlemen, we are here for the

7    purpose of conducting a preliminary examination and, if

8    required, a detention hearing in the matter of United States of

9    America versus Nevine Aly Elshiekh.

10             Before we begin, I would like to make a few remarks

11   that I think will be helpful to individuals present in the

12   courtroom attending the hearing this morning, as well as to the

13   Court.  I urge to listen carefully.

14             First, I would like to address briefly some of the

15   Rules of this Court regarding courtroom decorum that will

16   govern attendance here this morning, in addition to the

17   information that you have already received from the Court

18   regarding its hearing parameters.

19             I suspect this morning that you will hear testimony

20   that you may not agree with or that you find upsetting.  It is

21   natural that you may want to respond aloud to such testimony or

22   otherwise express your opinion.  However, this Court cannot

23   tolerate outbursts, talking in a raised voice, gesturing,

24   unnecessary movements, or other disruptive behavior.  Not only

25   does such behavior detract from the serious nature of these

1   proceedings, but it is disrespectful to the Court and the

2   independent role that this Court has in this case.

3         This particular courtroom, while very long, is very

4   narrow and movements of persons into and out of the courtroom

5   and within the gallery are often disruptive.  You should remain

6   seated during the hearing.  If you need to excuse yourself from

7   the courtroom before we recess, please discreetly attract the

8   attention of the security officers and quietly exit the

9   courtroom.  Otherwise, please remain seated.

10        Second, it may be helpful to inform those attending of

11  the particular nature of these proceedings.  The preliminary

12  examination, also called a probable cause hearing, is an

13  evidentiary hearing before a Magistrate Judge to determine

14  whether there is probable cause to hold a defendant who has

15  been charged by a complaint for further criminal proceedings in

16  the United States District Court.  The defendant in this case

17  is entitled to a preliminary examination unless it is waived.

18        At the preliminary examination, the Government must

19  establish to the Court's satisfaction that there is probable

20  cause to believe (1) that a crime has been committed and that

21  (2) the accused person has committed it.  The probable cause

22  finding may be based on hearsay evidence in whole or in part.

23  The accused's innocence or guilt is not determined at the

24  preliminary hearing.  Rather, the hearing serves only to

25  justify holding the defendant in custody or placing him or her

on pre-trial release conditions until such time as a Grand Jury returns an indictment or the United States Attorney files an information against the defendant.

Following the preliminary examination, if the Magistrate Judge finds that there is sufficient evidence to establish probable cause, the defendant must be held to answer in the District Court. On the other hand, if the Magistrate Judge determines the Government has not established probable cause to believe that an offense has been committed and the defendant committed it, the complaint against the defendant must be dismissed and the defendant discharged. The dismissal of the complaint, however, is without prejudice, meaning that the Government may prosecute the defendant at a later time.

The scope of the preliminary examination is narrow, its purpose merely to establish probable cause to believe that an offense has been committed, and that the defendant committed it. Again, the purpose of the hearing is not to convict or acquit the accused.

Accordingly, although the hearing is inquisitorial in nature, it is not the proper setting to test the admissibility of evidence or to require proof sufficient to convict the defendant. The trial itself, and only after an indictment has been returned, is the proper forum for such functions. For example, evidence which tends to prove the existence of an unconstitutional search and seizure, entrapment, a violation of

1  <u>Miranda</u>, or which bears on various other defenses is generally

2  irrelevant because it is not probative of the key issue of

3  probable cause.  The evidence advanced by the Government at the

4  preliminary examination must establish probable cause with

5  respect to each essential element of the offense charged as

6  well as with respect to the identity of the defendant.  The

7  Magistrate Judge's task is simply to make a practical, common

8  sense decision whether, given all of the circumstances set

9  forth, including the veracity and basis of knowledge of persons

10  supplying hearsay information, that there is a fair probability

11  that the defendant has committed a crime.  Certainly, proof

12  beyond a reasonable doubt or personal conviction are not

13  required, nor, on the other hand, is the mere possibility that

14  the defendant committed a crime is a sufficient basis on which

15  to find probable cause.

16       The Rules of Evidence, which govern the trial in a

17  criminal case in the United States District Court, do not apply

18  to a preliminary examination.  Other than with respect to

19  privileges, the Federal Rules of Evidence specifically make the

20  Rules inapplicable to preliminary examinations in criminal

21  case.  Moreover, the Federal Rules of Criminal Procedure allow

22  the Court's reliance on hearsay evidence when determining

23  probable cause.

24       With these introductory remarks dispensed with, I now

25  turn to this case.  Again, we're here for purposes of

1    preliminary examination and, if needed, detention with respect

2    to the case of United States of America versus Nevine Aly

3    Elshiekh.

4            Ms. Elshiekh, this morning, let me ask you:  Are you

5    under the effect of any kind of medication, any drug, or any

6    substance that you feel would prevent you from understanding

7    the proceedings this morning?

8            THE DEFENDANT:  No.

9            THE COURT:  Are you prepared to go forward with your

10   case at this time?

11           THE DEFENDANT:  Yes.

12           THE COURT:  Thank you.

13           Are there motions from counsel before we get started?

14           Ms. Moreno?

15           MS. MORENO:  Your Honor, upon reconsideration, no.

16           THE COURT:  Anything, counsel?  No motions?

17           MS. MORENO:  No, Your Honor.

18           THE COURT:  Okay.  All right.

19           MS. MORENO:  After consideration.

20           THE COURT:  I'll have the Government go with its, go

21   forward with its showing.

22           MR. SEVERO:  Your Honor, the Government will call

23   Julia Hanish to the stand, please.

24           THE COURTROOM DEPUTY:  Please state your name and

25   spell your last name for the Court.

 1              MS. HANISH:  Julia Hanish; J-U-L-I-A, H-A-N-I-S-H.

 2              JULIA HANISH, GOVERNMENT'S WITNESS, SWORN

 3              THE COURTROOM DEPUTY:  Please have a seat.

 4                         DIRECT EXAMINATION

 5   BY MR. SEVERO:

 6   Q    Would you please state your name for the Court?

 7   A    Julia Hanish.

 8   Q    By whom are you employed?

 9   A    I'm a special agent with the FBI.

10   Q    How long have you been so employed?

11   A    Almost eight years.

12   Q    And which section or divisions have you worked with?

13   A    I've worked on the criminal side of the FBI in the white

14   collar division, public corruption, and securities fraud.

15   Q    Have you -- where -- which section or area are you assigned

16   currently?

17   A    Currently, I'm assigned to the Joint Terrorism Task Force.

18   Q    Out of which area?

19   A    The Raleigh, North Carolina office.

20   Q    And were you so assigned in October of 2011?

21   A    I was.

22   Q    And did you receive or did the name Hysen Sherifi come to

23   your attention while you were working in that section?

24   A    Yes.

25   Q    And are you familiar with whether Hysen Sherifi has been

1  convicted, or was convicted of anything in October of 2011?

2  A    I am.

3  Q    And what was he convicted of?

4  A    He was convicted of conspiracy to provide material support

5  to terrorism, in violation of Title 18, United States Code,

6  2339(a); conspiracy to murder, kidnap, maim, and injure persons

7  in a foreign country, in violation of Title 18, United States

8  Code, 1956(b); convicted of possession of a firearm in

9  furtherance of a crime of violence, in violation of Title 18,

10 U. S. Code, 1924(c); and conspiracy to kill a federal officer

11 or employee, in violation of Title 18, U. S. Code, 1117.

12 Q    And was he convicted by a jury, if you know?

13 A    He was.

14 Q    And do you know upon that conviction where he was shipped

15 or housed pending his sentence?

16 A    Yes.  He was sent to the New Hanover County Detention

17 Facility.

18 Q    And that's in New Hanover, North Carolina?

19 A    Castle Hayne, North Carolina.

20 Q    Castle Hayne.

21     And after that time did your agency receive any information

22 involving Mr. Hysen Sherifi about a murder-for-hire plot?

23 A    Yes.

24     We were -- we received information that Mr. Hysen Sherifi

25 wanted assistance in killing three witnesses and an inmate who

1  defrauded him.

2  Q    And how did that information come to your agency?

3  A    It came through the Bureau of Alcohol, Tobacco, and

4  Firearms, or the ATF.

5  Q    Did they have a confidential source or witness who had

6  provided them information?

7  A    Yes.

8  Q    For purposes of this hearing, let's just refer to him as

9  Confidential Source No. 1.

10 A    Okay.

11 Q    Did you all find out some information about Confidential

12 Source No. 1?

13 A    Yes, we did.  We knew that he was a federal inmate

14 convicted of drug charges, drug and firearm charges.

15 Q    Having pending charges, you mean?

16 A    Yes.

17 Q    And did you find out from that agency whether he had

18 provided them information after his arrest that had led to the

19 arrest of other persons for either drug or weapons charges?

20 A    Yes, we did.

21 Q    And was that -- did that happen?

22 A    Yes.

23 Q    And did they find that information to be accurate and

24 correct?

25 A    They did.

1  Q   Following the receipt of that information, did your agency,

2  that being the Federal Bureau of Investigation, did y'all do

3  anything or make any contact with Confidential Source No. 1?

4  A   Yes.  Confidential Source No. 1 was contacted at the New

5  Hanover County Detention Facility and interviewed.

6  Q   And that was done by your agency?

7  A   Yes.

8  Q   And did you all receive some information from Confidential

9  Source No. 1 about Hysen Sherifi?

10 A   Yes.

11     We received information that he was planning and asking for

12 assistance to kill three witnesses and one inmate who had

13 allegedly defrauded Mr. Sherifi.  He wanted them killed.  He

14 wanted them beheaded.

15 Q   All right.  And at that time did your agency receive the

16 names from Confidential Source No. 1 of the three witnesses?

17 A   Yes, we did.

18 Q   And did you receive information at that time or later as to

19 why Mr. Sherifi wanted those witnesses killed?

20 A   Yes.  Because they testified against him in his federal

21 trial that, of which he was just convicted and to assist the

22 boy from Bosnia.

23 Q   And based upon your investigation, have you found out

24 anything about the boy from Bosnia?

25 A   Yes.

1    The, the boy from Bosnia he was referring to is Anes

2    Subasic, who is awaiting trial on his charges in the same

3    conspiracy.

4    Q   And to your knowledge based upon this investigation is,

5    does Mr. Sherifi, Hysen Sherifi either have a pending appeal or

6    believe he's going to have an appeal?

7    A   Yes.

8    BY THE COURT:

9    Q   Which is it?  He, he, he has appealed or he's -- what's the

10   status of the answer?

11           MR. SEVERO:  Judge, I'm, I'm not sure whether he has

12   or has not filed it, so.  But he, he believed at the time, you

13   know, I think the evidence would show he believed at the time

14   he had an appeal.

15           THE COURT:  She's testifying that Hysen Sherifi

16   believed at the time that he had an appeal or was contemplating

17   appeal of his case?

18           MR. SEVERO:  His jury trial, yes, Your Honor.  And I

19   just can't represent to the Court whether he has followed

20   through with that appeal or not.  I believe he has, Your Honor,

21   since it is a jury trial, but I don't want to relay that to the

22   Court without confirming it.

23           THE COURT:  Okay.  Go ahead.

24           MR. SEVERO:  All right.

25   BY MR. SEVERO:

1  Q    And did the boy from Bosnia, you said -- does he have a

2  pending trial?

3  A    He does.

4  Q    All right.  And is that for terrorism charges?

5  A    Yes.

6  Q    And would persons that were listed as confidential or

7  listed as witnesses in the Hysen Sherifi trial, would they also

8  be witnesses in the Subasic trial?

9  A    Yes, they would.

10  Q    And during this course of -- strike that.

11      Did at some point you have a further interview or did your

12  agency go back and interview Confidential Source No. 1 after

13  that initial interview?

14  A    Yes, we did.

15  Q    And did -- what, if any, information did you receive after

16  that from Confidential Source No. 1?

17  A    Very similar information, that three witnesses he would

18  like killed and also, the cellmate.  Also, he would, talked

19  about a sum of money which he would have his brother raise.

20  Q    Did you come to find out if he had a brother and who that

21  brother was?

22  A    Yes, we did.  His brother is Shkumbin Sherifi.

23  Q    All right.  And for the record, could you spell both

24  Shkumbin and Hysen?

25  A    Yes.  Hysen Sherifi; H-Y-S-E-N, S-H-E-R-I-F-I.  Shkumbin,

1  S-H-K-U-M-B-I-N, and then Sherifi, S-H-E-R-I-F-I.

2  Q    And was a plan discussed between Hysen Sherifi and

3  Confidential Source No. 1 about who would perform the killing

4  of these witnesses and the, that inmate?

5  A    Yes.  Confidential Source No. 1 advised that he had someone

6  who could do the hit and Mr. Sherifi wanted to make sure his

7  brother or whoever else was dealing did not have contact with

8  that person.  So he wanted to have a third party available that

9  they could deal with.

10 Q    And was a nickname or street name provided of the hit man?

11 A    Not at that time.

12 Q    At some point later was it?

13 A    Yes.

14 Q    And what was that nickname or street name?

15 A    "Tree" or "Treetop."

16 Q    After obtaining that information from Confidential Source

17 No. 1, did you all interact or have a meeting with any other

18 confidential sources?

19 A    Yes.  We met with another confidential source, Confidential

20 Source No. 2.

21 Q    And was that person a relation of Confidential Source

22 No. 1?

23 A    They were associated, yes.

24 Q    Did you all interview that person?

25 A    We did.

1  Q    That person agreed to assist law enforcement?

2  A    Yes.

3  Q    When you first spoke to that person did they provide you

4  with any information about telephone calls or making phone

5  calls involving Hysen Sherifi?

6  A    Yes.  CS 2 had previously done a three-way call, multiple

7  three-way calls for Hysen Sherifi.

8  Q    And can, for the record if you can explain what a three-way

9  call is.

10  A    Yeah.

11      When inmates at New Hanover County, when they make

12  telephone calls they use a personal identification number or a

13  PIN to make a phone call.  Sometimes inmates will make the

14  initial phone call and then ask that person to transfer them to

15  a third party.

16  Q    And why do inmates try to do that?

17  A    They'll do that often to, so the recording device does not

18  know what number they're calling, to, to hide who they're

19  calling or the, that telephone call.

20  Q    And are you familiar with the system that the New Hanover

21  County Jail uses to have phone calls go outside, from inmates

22  calling people on the outside?

23  A    Yes.  It's called Securus and it's a system outside of the

24  State of North Carolina.  The calls are placed at New Hanover

25  County and then those calls are directed to Securus outside of

1  North Carolina and then on to the party they're calling.

2  Q    And during your -- from November on, did you all receive

3  further information about the, from Hysen Sherifi, the three

4  person, three witnesses to be killed?

5  A    Yes.

6      We received the note that Mr. Hysen Sherifi had written

7  describing, giving the names of the three individuals, some

8  personal identifiers, as well as some vehicle identifiers, and

9  possible locations.

10     He also provided the name and possible location of the

11 inmate.

12 Q    And after receiving those three names did you compare those

13 three names with persons who had testified against Hysen

14 Sherifi at his trial?

15 A    Yes.

16 Q    And what did you notice about those names?

17 A    They were the same names and the descriptions were also

18 very accurate.

19 Q    On or about December, or slightly before December the 7th,

20 did you all receive a letter from anyone?

21 A    Yes.  We received a letter from CS 1.  This letter was

22 given to him by Hysen Sherifi and he had asked CS 1 to provide

23 that letter to CS 1's attorney so he could send it out so it

24 would not be searched by New Hanover County Detention Facility.

25 Q    And you're familiar with the rules of the New Hanover

1  County Detention Center?

2  A    Yes.

3  Q    And do they have the ability to or do they search mail that

4  is going from an inmate just to someone out in the general

5  public?

6  A    Yes.

7  Q    And so the mailing of this letter was to circumvent that?

8  A    Yes.

9  Q    And is there also any stamp affixed to a letter if it's

10 actually mailed from the New Hanover County Jail?

11 A    Yes.  When a letter is mailed it is stamped with a, a stamp

12 that has the name New Hanover County Detention Facility in it.

13 Q    And did this letter have such a stamp?

14 A    It did not.

15 Q    And did you come into possession of that letter?

16 A    Yes.

17 Q    And did you have -- what was the address on the letter,

18 both from the sending person and the receiving person?

19 A    The return address was, it was from Hysen Sherifi at a

20 Raleigh address, his Raleigh address, to Nevine at another

21 Raleigh address.

22 Q    Okay.  And have you later come to find out who lives at

23 that address without --

24 A    Yes.

25 Q    -- giving the address?

1   A    Yes.

2   Q    And who lives at that address?

3   A    Nevine Elshiekh.

4   Q    And based upon your investigation does anybody else live at

5   that address?

6   A    Yes.  Also her parents.

7   Q    And were they, based upon your investigation, were they

8   still living there in December of 2011?

9   A    Yes.

10  Q    Did you open or look at the letter?

11  A    Yes.

12  Q    Did you then mail the letter after that?

13  A    Yes, we did.

14  Q    Turning or directing your attention to December 21, 2011,

15  are you familiar with an activity that occurred on that date

16  involving Nevine Elshiekh and, or Nevine Elshiekh and Hysen

17  Sherifi?

18  A    Yes.

19  Q    And can you please describe that for the Court?

20  A    Yes.

21       Ms. Elshiekh had an appointment for a visit with Hysen

22  Sherifi.  She was observed -- well, her vehicle was observed

23  arriving at the New Hanover Detention Facility.  She then

24  signed in at the visitor desk at the New Hanover County

25  Detention Facility and went upstairs to visit with Hysen

1   Sherifi.

2   Q    And was that on December 21st?

3   A    That was.

4   Q    And was that meeting recorded?

5   A    It was.

6   Q    And have you had an occasion to listen to that meeting?

7   A    Yes.

8   Q    And was it a lengthy meeting?

9   A    It was.

10  Q    And are there --

11  BY THE COURT:

12  Q    Wait.  What do you mean by "lengthy"?

13  BY MR. SEVERO:

14  Q    How long was the meeting, if you know?

15  A    Sir, approximately 45 minutes.

16         THE COURT:  Go ahead.

17  BY MR. SEVERO:

18  Q    And did you have -- have you had an occasion to listen to a

19  recording of that meeting?

20  A    I have.

21  Q    And are there things that came to your attention in

22  listening to that meeting?

23  A    Yes.

24  Q    Can you give some of those to His Honor?

25  A    Yes.

1     Mr. Sherifi, Hysen Sherifi asked Ms. Elshiekh if she had a

2  pen.  He also then, it appeared, held something up to the, for

3  her to see and asked her to write something down.

4     Later in the conversation, we hear, could hear her

5  repeating an address.

6  Q   Okay.  And have you -- did you check that address versus

7  other information you had in your investigation?

8  A   Yes.

9  Q   And was that address associated with anyone?

10 A   It was associated with one of the witnesses who testified

11 against Hysen Sherifi and who he wanted killed.

12 Q   Did Hysen Sherifi tell her what, if anything, to do with

13 the addresses?

14 A   He wanted her to provide it to CS 2.

15 Q   Did she agree to do that?

16 A   Yes.

17 BY THE COURT:

18 Q   Did he -- what do you mean, "He wanted her to provide it to

19 CS 2"?  Did, did he ask her to provide it to CS 2?

20 A   Yes, sir, he did.

21 Q   And when you say the address is "associated" with, with the

22 witness, how, how is it so associated?

23 A   It's a previous address.

24 Q   Of what?

25 A   Of the witness.

1   Q    Of home?  Business?

2   A    Home.

3             THE COURT:  Go ahead.

4             MR. SEVERO:  All right.

5   BY MR. SEVERO:

6   Q    And was there anything else that came to your attention

7   during the course of that -- those conversation -- that -- this

8   conversation?  If not --

9   A    Not that I can recall.

10  Q    Okay.

11       After -- what happened after Ms. Elshiekh left the New

12  Hanover County Jail?

13  A    Ms. Elshiekh -- I observed Ms. Elshiekh leaving the jail

14  and entering her vehicle, a 2004 Volvo.

15  Q    Do you see the person in the courtroom who you've

16  identified as Nevine Elshiekh, who you know as Nevine Elshiekh?

17  A    I do.

18  Q    Can you please identify her for the record?

19  A    Yes.  She's sitting at the defendant's table.

20  Q    And what is she wearing, or can you describe something that

21  she has on?

22  A    She's wearing a hijab, a head wrap.

23  Q    And have you had an occasion to hear her voice through the

24  course of the conversation, through the course of this

25  investigation?

1   A    I have.

2   Q    And was that the same voice that you recognized on the

3   recordings from December 21, 2011?

4   A    Yes.

5   Q    And did -- or -- did Ms. Elshiekh, to your knowledge, place

6   any phone calls that day or shortly after that associated with

7   the addresses?

8   A    Yes.  Ms. Elshiekh called CS 2 and left a voicemail saying

9   that she was Hysen Sherifi's friend and she had some

10  information for her.  CS 2 then called her back and

11  Ms. Elshiekh again said she was Hysen Sherifi's friend and

12  provided the names and addresses for two of the witnesses and

13  the one inmate that Mr. Sherifi wanted killed.

14  Q    On or about December 27, 2011, did you, did you come into

15  contact with a copy of a letter?

16  A    Yes.

17  Q    Can you tell the Court about that?

18  A    Yes.

19       A letter was mailed, or was received by Hysen Sherifi at

20  the New Hanover County Detention Facility.  It was from

21  Ms. Elshiekh dated, postmarked -- excuse me -- December 27th.

22  And included in that letter was a screenshot of a Twitter

23  account in the name of one of the witnesses who was to be

24  killed.

25  Q    And was there an address or a return -- was there a return

1  address on the envelope?

2  A    Yes.

3  Q    And what was the return address?

4  A    It was a Raleigh, North Carolina address, her parents'

5  address.

6  Q    Turning or directing your attention to around December 30th

7  or moving forward, did you all receive information about a

8  payment plan or was there a payment involving "Treetop" or

9  "Tree"?

10  A    Yes.  Hysen Sherifi and CS 1 agreed the payment plan would

11  be as follows:  $5,000 for each witness, three witnesses, a

12  total of $15,000.  $5,000 would authorize one witness to be

13  killed and half of the 15,000, so 70, 7,500 would authorize all

14  three to be killed.  The remaining 7,500 would be paid over the

15  course of a year.

16  Q    At some point in December moving into January, was anybody

17  else identified, or was somebody identified as a person who

18  might be bringing money?

19  A    Yes.  In the beginning of December, Mr. Sherifi told CS 1

20  that there was a young Muslim girl who would be, possibly, who

21  he had been exchanging correspondence with who would possibly

22  help him get the money and also meet with CS 2.

23  Q    Turning or directing your attention to January the 2nd --

24  strike that.

25       Prior -- just recently before January the 2nd of 2012, did

1  you or your agency prepare any type of photograph?

2  A    Yes.  We prepared a photograph of one of the witnesses to

3  be a, to look as though it was a surveillance photograph to be

4  presented as proof that they were -- they had found -- "Tree"

5  had found one of the witnesses that Hysen Sherifi wanted

6  killed.

7  Q    And was that photograph actually of one of the witnesses?

8  A    It was.

9  Q    Was that a photograph of somebody who was, the person that

10 was listed in the Twitter page that had been postmarked 12/27?

11 A    Yes.

12 Q    And turning or directing your attention to January the 2nd

13 of 2012, can you tell His Honor what happened on that date?

14 A    Yes.

15     On January 2, 2012, Ms. Elshiekh's vehicle, the 2004 Volvo,

16 was observed at her residence in the morning.  A little later

17 on in the morning --

18 Q    If I can stop you for a moment, is that -- what -- is that

19 residence in --

20          THE COURT:  Wait a minute.

21          Thanks.  Go ahead.

22          MR. SEVERO:  All right.

23 BY MR. SEVERO:

24 Q    Where is that residence located, not the exact street

25 address, just the county?

1    A    In Raleigh, North Carolina in Wake County.

2    Q    All right.  And was -- what, if anything, was observed

3    after that?

4    A    Well, after that, Ms. Elshiekh was observed leaving the

5    area of her residence and driving to a coffee shop also in

6    Raleigh, North Carolina.  Once arriving there, she was observed

7    meeting with an individual identified as Shkumbin Sherifi.

8    Q    Would that be the brother of Hysen Sherifi?

9    A    Yes.

10   Q    And are you familiar with a nickname or street name of Mr.

11   Shkumbin Sherifi?

12   A    Yes.  He also goes by "Beemie" (phonetic).

13   Q    All right.  What, if anything, happened next?

14   A    After the meeting, Ms. Elshiekh was observed driving

15   eastbound on Interstate 40 to Wilmington, North Carolina.

16   Q    Did she go to any particular -- did she arrive in

17   Wilmington, North Carolina?

18   A    She did, yes.

19   Q    All right.  And did surveillance observe her driving on

20   Interstate 40?

21   A    Yes.

22   Q    Was she observed arriving somewhere in Wilmington, North

23   Carolina?

24   A    Yes.  She arrived at a parking lot of a store in

25   Wilmington.  She was then observed getting out of her vehicle

1   and meeting with CS 2.  They both exited their vehicle.

2   Q    And was this meeting video recorded?

3   A    Yes.

4   Q    Have you had a chance to review that?

5   A    Yes.

6   Q    And do -- did you observed anybody in the courtroom in that

7   video?

8   A    Yes.  Ms. Elshiekh.

9   Q    Tell the Court what happened during their meeting.

10  A    As I said, they both, Ms. Elshiekh and CS 2 got out of

11  their cars and introduced themselves and then CS 2 said she had

12  a photo from "Treetop" and "Treetop" wanted to make sure it was

13  the right person to be killed.

14  Q    And she used the word "to be killed"?

15  A    She did.

16  Q    And did Ms. Elshiekh respond to that?

17  A    She said, "Okay, 'Treetop.'"

18  Q    And did CS No. 2 say anything after that?

19  A    Again, she reiterated wanted, she wanted to make sure it

20  was the right person to be killed and she asked Ms. Elshiekh if

21  she had any money for her at that time.

22  Q    For her or for "Treetop"?

23  A    For "Treetop."  I'm sorry.

24  Q    And what, if anything, did Ms. Elshiekh say at that time?

25  A    Ms. Elshiekh said she did have some money, but she didn't

1    have permission from Sherifi at that time to give it to her.

2    And she would meet him at 1:00 and would ask him about the

3    money.

4    Q    Was -- did CS No. 2 give anything to the defendant at that

5    time?

6    A    Yes.  She gave her the photograph we prepared of the

7    witness.

8    Q    And that, that photograph was taken with his permission, is

9    that correct?

10   A    Yes.

11          THE COURT:  I'm sorry.  Was taken with what?

12          MR. SEVERO:  That photograph was taken with his

13   permission.

14          THE COURT:  Okay.

15   BY MR. SEVERO:

16   Q    What, if anything, did Ms. Elshiekh do next?

17   A    Ms. Elshiekh was then observed driving to the New Hanover

18   County Detention Facility, entering the facility, and meeting

19   with Hysen Sherifi.

20   Q    And to your knowledge, was that meeting recorded?

21   A    Yes.

22   Q    And have you had an occasion to listen to that recording?

23   A    Yes.

24   Q    And about how long was that meeting?

25   A    Again, about 45 minutes.

1  Q    All right.  And did there come a time during that meeting

2  that Ms. Elshiekh mentioned about, anything about communicating

3  with Hysen Sherifi's brother?

4  A    Yes.  She said that "Beemie," his brother, "Beemie," and

5  her were -- he kept her company by texting her on the way to

6  Wilmington.

7  Q    And did there -- was there a part of the conversation -- or

8  what was -- tell the Court about any conversations that came

9  to, anything that came to your attention during the course of

10 this conversation.

11 A    Mr. Sherifi asked Ms. Elshiekh if, if she had it and if she

12 had met with Miss D or had them.  She then responded, "There's

13 only one," and it sounded as though she was showing the photo.

14 Then you could hear writing and she said, "Can you see this?

15 And just for future reference she was just talking, talking,

16 talking and she shouldn't do that."

17 Q    During -- and the name "Miss D," is that a nickname or a

18 street name for CS No. 2?

19 A    Yes.

20 Q    Did there come a time during this conversation when there

21 was any mention again about photographs or pictures?

22 A    Yes.  Later on in the conversation Hysen Sherifi asked

23 Ms. Elshiekh if he could see the "pic" again.  And then he

24 asked her to -- he repeated "the pic" twice and then he asked

25 her to hold it up, hold it closer, move it there, move it to

1   the right, move it to the left, those types of instructions.

2   And he then also told her to show, she could show "Beemie."

3   Q    And did he identify -- did Hysen Sherifi during the course

4   of this conversation identify whether he knew the person in the

5   picture?

6   A    He said that he was sure it was the right person.

7   Q    All right.  And what, if anything, happened after the

8   meeting?

9   A    After the meeting, Ms. Elshiekh was observed driving back

10  to meet with CS 2 in the parking lot.

11  Q    If I can have you back up for a moment.

12       During the meeting between Ms. Elshiekh and Hysen Sherifi,

13  was there any discussion about the brother and the brother's

14  future travel plans?

15  A    Yes.  "Beemie" and his mother were planning on visiting

16  Hysen Sherifi on Saturday, the following Saturday.

17  Q    And moving back, you -- did you -- Ms. Elshiekh left the

18  New Hanover County Jail?

19  A    Yes.

20  Q    Okay.  And were there any phone conversations between

21  Ms. Elshiekh and anyone upon her leaving the jail?

22  A    Upon her leaving the jail, she received a phone, a phone

23  call from Hysen Sherifi where he asked her if she was on her

24  way to meet Miss D and how much she had.

25  Q    Okay.  And tell the Court about that conversation.

1  A    She responded in a foreign language the amount that he

2  didn't understand.  He then asked her again what it was and she

3  attempted to explain to him how much.  They finally came to the

4  understanding and it was said that it was $750.

5  Q    Where, if any -- where did Ms. Elshiekh go after that?

6  A    After that, she went to meet CS 2.

7  Q    And did they, in fact, meet?

8  A    They did.

9  Q    And what, if anything, hap -- and was that video and audio

10  recorded?

11  A    It was.

12  Q    And what, if anything, happened during the second meeting?

13  A    They both exited their vehicles and then entered

14  Ms. Elshiekh's vehicle.  CS 2 asked Ms. Elshiekh if she had

15  confirmed the photo.  She said, "Yes."  Then she appeared to

16  not want to speak.

17  Q    What happened next, if you recall?

18  A    Then they -- there was talk of a dominoes box and CS 2 was

19  heard count, or CS 2 said 750, counted the money, that it was

20  $750.

21  Q    All right.  When you say there was talk of a dominoes box,

22  who mentioned the dominoes box?

23  A    Ms. Elshiekh.

24  Q    And you said there was a counting of $750?

25  A    Yes.

1    Q    What, if anything, happened then?

2    A    Then Ms. Elshiekh and CS 2 parted ways and Ms. Elshiekh was

3    observed driving back to Raleigh, North Carolina on I-40.

4    Q    And did CS No. 2 meet with y'all right after that?

5    A    Yes.

6    Q    Did -- were -- was your agency provided anything from CS

7    No. 2?

8    A    Yes.

9    Q    What were you provided?

10   A    We were provided a dominoes box with dominoes in it.  Also

11   in it was a white envelope with written 750 on it and in the

12   envelope was $750.

13        There was also a scrap of paper which on the front said,

14   "Pic confirmed" and on the back said, "His brother will bring

15   the rest next Saturday."

16   Q    Was there a phone conversation, or did you become aware of

17   a phone conversation following this meeting between the

18   defendant and Hysen Sherifi on the 2nd?

19   A    It was actually between driving from New Hanover County

20   Detention Facility by Ms. Elshiekh to, to the meet.

21   Q    All right.  Is this the, the one in which 750 was

22   mentioned?

23   A    Yes.

24   Q    And during that phone call was there anything else that

25   came to your attention?

1  A   Yes.

2      During that phone call Ms. Elshiekh connected Hysen Sherifi

3  on a three-way call to his wife in Kosovo.  Towards the end of

4  the call Ms. Elshiekh broke into the call and asked Sherifi,

5  Hysen Sherifi, if she should provide the photograph back to

6  Miss D and he says, "No," to keep it.

7  Q   Turning or directing your attention to January the 6th,

8  2012, are you familiar with a phone call on that day between

9  Nevine Elshiekh and Hysen Sherifi?

10 A   Yes.

11 Q   And --

12         THE COURT:  I'm sorry.  What date was that?

13         MR. SEVERO:  January the 6th.

14         THE COURT:  Okay.  I'm sorry.

15 BY MR. SEVERO:

16 Q   And have you had an occasion to listen to that phone call?

17 A   I have.

18 Q   And did that phone call occur over the Securus phone

19 system?

20 A   It did.

21 Q   And was there anything that stood out, or came to your

22 attention about the time of the phone call?

23 A   About the time?

24 Q   Yes.

25 A   I'm sorry.

1  Q    Not the exact time, but what, where it occurred.

2  A    It, it occurred at Ms. Elshiekh's work.

3  Q    Okay.  She was calling from her work?

4  A    Yes.  Well, he was calling her and she was at her work.

5  Q    Did she, in fact, answer the phone?

6  A    Yes.

7  Q    During the course of that conversation, did anything come

8  to your attention or stand out in your attention as it relates

9  to this investigation?

10  A    Yes.

11      Ms. Elshiekh and Hysen Sherifi discussed "Beemie," Shkumbin

12  Sherifi, selling some items at a pawn shop and Ms. Elshiekh

13  said she directed "Beemie" four different places to go.

14      She also points out that on Sunday when Shkumbin Sherifi is

15  meeting with Hysen Sherifi his mother will be there and she

16  should, he should meet with Miss D while his mother is meeting

17  with Hysen Sherifi.

18  Q    So that the mother and "Beem" -- so that the mother

19  wouldn't be present for the meeting with Miss D?

20  A    Yes.

21  Q    And this happened while she was at work?

22  A    Yes.

23  Q    And did cer -- okay.

24      Turning or directing your attention to January the 7th,

25  2012, are you familiar with a phone call between Nevine

1  Elshiekh and Hysen Sherifi on that day?

2  A   Yes.

3  Q   And is that, again occur over the Securus phone system?

4  A   Yes.

5  Q   And what, if anything, stood out or came to your attention

6  during the course of that phone conversation?

7  A   During the phone call Ms. Elshiekh informs Hysen Sherifi

8  that they're done, "Beemie" is done.  He has $5200.  Hysen

9  Sherifi then repeats multiple times $5200, $5,200 in various

10 ways and appears very excited.

11 Q   All right.  And did she make any comments about being in

12 contact with "Beemie" while this phone conversation's going on?

13 A   Yes.  She says she is on the Internet with him and he's

14 responding to her right now.  She asks if he knows what to do

15 with Miss D.  Hysen Sherifi says, "He does, but if you could

16 tell him again, that would be helpful.  So if you could tell

17 him again, that'd be good."

18 Q   Turning or directing your attention to January the 8th,

19 2012, are you familiar with an event that occurred on that

20 date?

21 A   Yes.

22     On January 8th, Shkumbin Sherifi and his mother were

23 observed driving east on Interstate 40 after leaving their home

24 and then observed going to the New Hanover County Detention

25 Facility to visit Hysen Sherifi.

1  Q    Okay.  Did they travel over Interstate 40?

2  A    They did.

3  Q    And were they observed arriving in Wilmington?

4  A    Yes.

5  Q    And where, if anywhere, did they go?

6  A    They went to the New Hanover County Detention Facility.

7  Q    Did they, in fact, meet with Hysen Sherifi?

8  A    They did.

9  Q    And have you -- was that -- what language -- was that

10 language in English or another language?

11 A    Another language.

12 Q    And has that been listened to by someone who is fluent in

13 that language?

14 A    Yes.

15 Q    And is -- during the course of the conversations is there

16 any conversation between Shkumbin Sherifi or "Beemie" and Hysen

17 Sherifi about money and Miss D?

18 A    Yes.  Hysen Sherifi informs Shkumbin "Beemie" Sherifi to

19 provide 4,250 for Miss D out of the total of $5,200 and to

20 give, keep 200 for himself and to give the rest to her.

21 Q    And after that is -- are there texts or is there some

22 communication with CS No. 2?

23 A    Yes.  CS No. 2 received a phone call from someone

24 representing themselves as Shkumbin's sister.  I think she

25 might have said Sherifi's sister and trying to help him locate

1  her because his phone was not working.

2  Q    And are -- is information exchanged as to where CS No. 2 is

3  at the time?

4  A    Yes.

5  Q    And is that in a parking lot in Wilmington?

6  A    Yes.

7  Q    Is there a meeting between CS No. 2 and Shkumbin Sherifi on

8  January the 8th, 2012?

9  A    Yes.

10  Q    And tell the Court about that.

11  A    Shkumbin Sherifi entered the car of CS 2.  She asked him

12  how much -- well, they introduced themselves.  She asked him

13  how much he had.  He said 4250.  He then asked her to pull

14  forward 'cause he was concerned about his mother seeing what

15  was happening.

16  Q    And did she do that?

17  A    She did.

18  Q    What, if anything, happened then?

19  A    She again asked him how much he had.  Said he had 40,

20  $4,250.  She then counted the money.  Previously, he had told,

21  asked her if she had previously received $750.  She said she

22  had.  He asked from who.  She said a female.  She didn't

23  remember who and "Beemie" said, "Nevine."  And she agreed.

24      Going forward, after she counted the money CS 2 advised

25  "Beemie" that 42, 4,250, plus 750 was $5,000 and that would

1  only be enough money for one person and she wanted him to ask

2  Sherifi which one he wanted killed, the Arab or the black.

3  Q   And did Sherifi leave after that?

4  A   He did.

5  Q   Turning your attention or to -- no -- to January 13th of

6  2012, was anybody sentenced on that date?

7  A   Hysen Sherifi, Omar Hassan, and Ziyad Yaghi.

8  Q   Okay.  And did the defendant attend that sentencing?

9  A   Yes.

10 Q   And did Shkumbin Sherifi attend that sentencing?

11 A   Yes.

12 Q   Turning or directing your attention to January 20, 2012,

13 was there a phone call between Nevine Elshiekh and Hysen

14 Sherifi on that date that you're aware of?

15 A   Yes.  Hysen Sherifi called Ms. Elshiekh and asked her to

16 let "Beemie" know to come by himself to the visit on Sunday.

17 He asked her to get in touch with "Beemie" and they discussed

18 doing that over e-mail, over Twitter, and over text.

19 Q   Had information been given to Hysen Sherifi in this time

20 period about anything being done?

21 A   Yes.  He had received information that something was needed

22 to be picked up from Miss D.

23 Q   And was that -- what was that in relationship to?

24 A   I'm sorry.  In relationship to the hit, he, he was informed

25 that it had been done and proof would -- he had previously

1  requested a photo as a trophy and he was told that on Sunday

2  the photo would, would be in Wilmington so he could see it.

3  Q   Okay.  And Sunday being January 22nd?

4  A   Yes.

5  Q   Okay.  Now backing up -- I'm sorry to jump around -- but

6  backing up to January 20, 2012 in that phone call, was there

7  anything that stood out and came to your attention?

8  A   Yes.  Hysen Sherifi asked Ms. Elshiekh if she was wanded or

9  searched when coming up to visit him at the New Hanover County

10 Detention Facility.  She said she was, but she was usually

11 allowed to bring pen and paper but some, it, it depended when

12 she came if she was allowed to or not.

13      So she was going to put a pencil and paper in her pocket in

14 case they would not let her bring her notebook in.

15 Q   And did she make any state, anything during the course of

16 that conversation about if she was in contact with "Beemie" or,

17 and if so, how?

18 A   Yes.  She said that she had e-mailed him.

19 Q   And turning or directing your attention to January 21,

20 2012, are you aware of a phone call between Hysen Sherifi and

21 the defendant on that date?

22 A   Yes.

23 Q   And that -- did that again occur over the Securus phone

24 line?

25 A   Yes, it did.

1  Q   Okay.  And does anything of that conversation stick out to

2  your attention?

3  A   In that conversation Ms. Elshiekh inquired if "Beemie" had

4  a good plan together for when he met Miss D.  She said that she

5  had e-mailed him, Twittered him, and texted him and she e-

6  mailed him what to bring, to bring some -- she -- I'm sorry.

7  Excuse me.

8      I'm going to have to have you ask again.  I lost my train

9  of thought.

10 Q   All right.  During the course of that conversation, was

11 there anything about placing things in your pocket or anything

12 like that?

13 A   Yes.  Mr. Sherifi was very concerned that what "Beemie"

14 picked up from Miss D, that it come to him so he could see it

15 and he told Ms. Elshiekh that.  And so he asked her again to e-

16 mail "Beemie" about that to make sure to bring it with, with

17 him and to put it in his pocket so it could get up to see

18 Mr. Sherifi.

19 Q   And to your knowledge, was there any conversation or

20 contact between "Beemie" and Ms. Elshiekh about the meeting on

21 the 22nd involving the Sherifis?

22 A   I don't know other than her saying that she was texting or

23 e-mailing.

24 Q   All right.  Did she meet with Hysen Sherifi on the 21st?

25 A   Yes.

1  Q    And for what reason?

2  A    For a visit and to pick up his property that was in his

3  jail cell.

4  Q    Turning or directing your attention to January 22nd of

5  2012, are you familiar with the events that happened on that

6  date?

7  A    Yes.

8  Q    Can you summarize those for the Court, please?

9  A    Yes.

10      Shkumbin Sherifi, "Beemie," was observed driving on,

11  leaving his home and driving on Interstate 40 towards the

12  Wilmington area.  On the way there he stopped and met with CS

13  2.  At that time she provided him with two photos, a photo of a

14  severed head and a photo of a man in a shallow ditch that, who

15  appeared to be dead.

16  Q    And who was the person in the photograph without giving the

17  name?

18  A    One of the witnesses against Hysen Sherifi.

19  Q    The same person depicted in the photograph that the

20  defendant had a, had gotten from CS 2 and shown to Hysen

21  Sherifi?

22  A    Yes.

23  Q    And upon receiving those photographs where did "Beemie" or

24  Hysen Sherifi [sic] go?

25  A    He went to the New Hanover County Detention Facility where

1   he met with Hysen Sherifi.

2   Q    And did they, in fact, meet?

3   A    Yes.

4   Q    And did "Beemie" show the photographs to Hysen Sherifi?

5   A    Yes.

6   Q    Was there a conversation between Hysen Sherifi and CS No. 1

7   following the showing of those photographs?

8   A    Yes.

9   Q    And was that conversation recorded?

10  A    It was.

11  Q    Have you had occasion to hear parts of that conversation?

12  A    Yes.

13  Q    And were there any parts of that conversation that stood

14  out to your attention?

15  A    Yes.  Mr. Sherifi said that it was done in daylight and it

16  looked like the man had been placed, shot and placed in a

17  shallow grave.  He said they shouldn't have wasted the bullet.

18      He also said he -- well, he said he felt a lot better and

19  that this individual would be sleeping a long time.

20      He also said that he was beheaded in the throat area.  It

21  looked like a cell phone pic and these pictures, he wanted to

22  give to his girl so she could give them to the Boyds in case

23  they chose to testify.

24  Q    And the Boyds were, they had been witnesses who testified

25  against Hysen Sherifi?

1   A    Yes.

2   Q    And would they be witnesses in a retrial of Hysen Sherifi?

3   A    Yes.

4   Q    And would they also be witnesses against Subasic?

5   A    Yes.

6   Q    And was an arrest of Shkumbin Sherifi done on that day?

7   A    Yes.  He was arrested as he was leaving the visit with

8   Hysen Sherifi.

9   Q    And were any photographs found on his person?

10  A    Yes.  In his front jacket pocket they found the, a

11  photograph of the severed head, photograph of the dead body,

12  the photograph of, the surveillance photograph with, which was

13  given to Ms. Elshiekh, and a receipt for $5200.

14  Q    And was that for items that had been provided or, or some

15  of the items provided by Ms. Elshiekh?

16  A    One, yes.

17  Q    All right.

18  A    Oh.  I'm sorry.  The receipt?

19  Q    No.  The items from the receipt, were those items that had

20  been provided by Ms. Elshiekh?

21  A    Yes.

22  Q    Turning or directing your attention to, again, on the 22nd,

23  was Ms. Elshiekh arrested?

24  A    Yes, she was.

25  Q    All right.  And were cell phones acquired from

1  Ms. Elshiekh?

2  A    Yes.

3  Q    And did you note anything about the numbers of the cell

4  phones?  Did they match up with anything else in this

5  investigation?

6  A    Yes.  Both cell phones matched phone numbers used to call

7  CS 2 and also that Hysen Sherifi called from his Securus

8  account at New Hanover County Detention Facility.

9  Q    After she was arrested, was she taken anywhere?

10 A    Yes.  She was taken to the Raleigh office of the FBI.

11 Q    And while she was there was she given any rights?

12 A    Yes.  She was read her rights.

13 Q    And after having read her rights did she do anything?

14 A    She waived those rights and signed the Advice of Rights

15 form.

16 Q    And were -- was she in handcuffs after that?

17 A    No.  She was not in handcuffs.  Once we brought her to the

18 Raleigh office, she was uncuffed.

19 Q    All right.  And did you allow her to wear anything in

20 particular during -- after -- during this time?

21 A    Yes.  She was allowed to, to wear everything that was on

22 her, her head wrap, and her jacket, everything.

23 Q    All right.  And did -- after waiving her rights, did she

24 agree to speak with y'all?

25 A    Yes.

1  Q   Did she, in fact, do that?

2  A   Yes.

3  Q   Did she tell you how she came to meet Hysen Sherifi?

4  A   Yes.  She said that in October of 2011 she attended the

5  trial of, of Hysen Sherifi, Omar Hassan, and Ziyad Yaghi

6  because she was a family friend of the Hassan family.  She said

7  during that time she started writing letters to Omar Hassan,

8  Ziyad Yaghi, and Hysen Sherifi and her and Hysen Sherifi

9  exchanged numerous letters and then telephone calls.

10 Q   And did she indicate to you that she started, continued

11 talking to him and developed a relationship with him?

12 A   Yes.

13 Q   Did she make any statements to you about addresses of any

14 people?

15 A   Yes.  She advised me that she was given addresses by Hysen

16 Sherifi during one of her visits with him at the New Hanover

17 County Detention Facility and she provided those addresses to a

18 woman she knew as Miss D.

19 Q   And did she -- did -- how did she refer to those people?

20 Did she call them by any name or say anything about them?

21 A   She called them informants.

22 Q   Did she say anything and provide you with any information

23 about obtaining money or getting money as it relates to this?

24 A   Yes.  She advised me that she met with "Beemie" who gave

25 her $710 and she then added $40 to that amount.

1    She also gave "Beemie" different pieces of gold in jewelry

2  of hers for him to pawn.

3  Q   Okay.  And did she say anything about getting a picture

4  from Miss D?

5  A   Yes.  She explained that she met with Miss D before one of

6  her visits.  Miss D provided her with the photograph and asked

7  her if this was the -- "Tree" -- said "Treetop" wanted to know

8  if this was the right person to be killed.  She said she took

9  that photograph to Mr. Sherifi.  Mr. Sherifi then identified

10  that photograph and told her to pay Miss D.

11    She then went back to Miss D, confirmed that that were the

12  right person to be killed, and provided her with $750.

13  Q   Did she tell you that she knew that they were going to kill

14  somebody as of January 2nd?

15  A   Yes.

16  Q   Did she tell you anything about Subasic or help -- or

17  whether -- what Sherifi was trying to do with Subasic?

18  A   Yes.  She said that Sherifi said he was trying to assist

19  Anes Subasic and she also said that she was trying to assist

20  Anes Subasic.

21  Q   All right.  Did she confirm to you that she told "Beemie"

22  to come alone on the 22nd?

23  A   Yes.

24        MR. SEVERO:  May I have just a moment, Your Honor?

25        THE COURT:  Yes, sir.

1        MR. SEVERO:  May I have just a moment?

2        THE COURT:  Yes, sir.

3     (Pause)

4        MR. SEVERO:  Your Honor, tender the witness.

5        THE COURT:  All right.

6        Ms. Moreno or Mr. Swift?

7        MR. SWIFT:  I'll handle this for the defense, Your

8  Honor.  Thank you.

9        THE COURT:  I'm sorry?

10       MR. SWIFT:  I'll handle it for the defense.

11       THE COURT:  Okay.  Go ahead.

12       MR. SWIFT:  Thank you.

13                    CROSS-EXAMINATION

14  BY MR. SWIFT:

15  Q   Good morning.

16  A   Morning.

17  Q   Let's start back with the timeline.

18      You said that -- I believe you testified that Hysen

19  Sherifi, Omar Hassan, and Ziyad Yaghi were convicted on October

20  13th, is that correct, of last year?

21  A   Yes.

22  Q   Now shortly after that, you learned of a plot involving one

23  of those, Hysen Sherifi, correct?

24  A   About a month later, over a month.

25  Q   Do you know what date you, when CS 1 first approached you

 1   or Confidential Informant 1 first approached you?

 2   A    We first interviewed him on the 18th of November.

 3   Q    18th of November.

 4        Did you, he tell you when they'd had the conversation?

 5   A    He -- not exactly, not an exact date, I don't believe.

 6   Q    He didn't give you an exact date.  This conversation was

 7   the first one where Hysen Sherifi had approached the CI 1 about

 8   helping with the murder-for-hire, or murders-for-hire?

 9   A    This was the first time that the FBI interviewed him.  I

10   was not present, but this is the first time he was interviewed

11   by the FBI.

12   Q    Now at any point did you all put listening devices on CI 1?

13   A    Yes.

14   Q    When did you first do that?

15   A    December 30th.

16   Q    December 30th?

17   A    Yes.

18   Q    Now you indicated that Nevine, that the defendant here,

19   Nevine, started writing to all three of the defendants, that

20   she told you that?

21   A    Yes.

22   Q    Were you able to confirm that?  Have you gotten letters,

23   found the letters?

24   A    Yes.

25   Q    Do you have copies of all the letters that she's written?

1    A    I don't know if we have all.  We have lots of them.

2    Q    Do you have copies of letters to Omar Hassan?

3    A    Yes.

4    Q    Copies of letters to Ziyad Yaghi?

5    A    Yes.

6    Q    And Hysen, and Hysen Sherifi?

7    A    Yes.

8    Q    Do you know what the date of the first of those letters is?

9    A    I know the date of the first letter for Hysen Sherifi, I

10   believe, was October 24th.

11   Q    So that was after the trial had concluded?

12   A    Yes.

13   Q    In your investigation, did you discover that they'd ever

14   had any contact prior to October 24th and that letter?

15   A    I know she sent one letter in September 2009.  It appeared

16   she was a volunteer sending a letter, but it appears to me the

17   first letter where she has actual communication with him is on

18   the 24th of October.

19   Q    So that's after his conviction?

20   A    Yes.

21   Q    Now did either of the other two defendants, or other two of

22   the individuals from the October 13th, Omar Hassan or Ziyad

23   Yaghi, ever write back to her?

24   A    Yes.

25   Q    And she corresponded with them as well?

1  A    Yes, not to the same extent, but yes.

2  Q    And Hysen Sherifi, he started writing back to her?

3  A    Yes.

4  Q    And he certainly -- in these letters he was certainly

5  flattering to her, wasn't he?

6  A    Yes.

7  Q    And certainly attempting to enlist her aid?

8  A    Yes.

9  Q    And eventually, she agreed to speak with him on the phone,

10 correct, and he called her?

11 A    She provided him her telephone number, yes.

12 Q    Now did you monitor every phone call between them?

13 A    They were all monitored by New Hanover County Detention

14 Facility.  I believe that we have monitored most of them,

15 although I haven't, I can't say that for sure that very single

16 call was monitored by us.

17 Q    In any of those calls prior to the end of December, did,

18 the initial calls, did he talk to her about witnesses or taking

19 care of witnesses in his case against him?

20 A    He asked -- he gave her the names of the witnesses --

21 Q    Did he tell her --

22 A    -- and he asked her to research them, them on Google based

23 on --

24 Q    Did he tell her why?

25 A    At that point, no.

1  Q    In fact, when he gave her those names was that during a

2  visit?

3  A    He gave them to her at two different times.  The, the visit

4  -- he asked her in a telephone call if she knew who the

5  informants were.  She said, yes, and he asked her to research

6  them.  In the visit is when he gave her the names and the

7  addresses.

8  BY THE COURT:

9  Q    I'm sorry.  He, he asked her if she knew who the informants

10  were?

11  A    If she knew the informants' names.

12  Q    The informants from the October trial?

13  A    Yes.

14  Q    Okay.

15  BY MR. SWIFT:

16  Q    Now the first time that the defendant visited was in late

17  November or early November -- excuse me -- late November, is

18  that correct?

19  A    The first time she visited I believe was December 17th.

20  Q    December 17th, as late as that --

21  A    Yes.

22  Q    -- was her first visit?

23  A    Yes.

24  Q    And that during that visit is when he gave her the names?

25  A    No.  That was the next week, December 21st.

1   Q    Okay.  Did he ask -- did he first ask, give her names to

2   research on the December 17th visit?

3   A    I do not know about the December 17th visit.

4   Q    You said that there was a letter that was sent out to her

5   during your testimony earlier through CI 1?

6   A    Yes.

7   Q    You, of course, have that letter, correct, or a copy of it?

8   A    We have a copy.

9   Q    Anything in this confidential letter, was there anything in

10  there where it explained what he wanted to enlist her aid in?

11  A    No.

12  Q    What did he talk about in it?

13  A    It was a social letter with bracelets.

14  Q    Okay.  A social letter with bracelets?

15  A    Yes.  He had made bracelets and there were bracelets in

16  there.

17  Q    Okay.  So in this opportunity to talk to her confidentially

18  he didn't reveal what the plan was?

19  A    No.

20  Q    Now you said that ever he gave her the names on the

21  December 21st meeting, he gave her a list of names and had her

22  write down addresses, is that correct?

23  A    Yes.

24  Q    She called up the person we call CI 2, or Miss D?

25  A    Yes.

1  Q   Which is not her real name so we can use Miss D, correct?

2  A   Yes.

3  Q   I'll use Miss D.  He called up -- she called up Miss D?

4  A   Yes.

5  Q   And she provided the names to Miss D?

6  A   Yes.

7  Q   Now let's go back.  Were you recording that call?

8  A   Yes.

9  Q   You had that call on monitor so you have an exact

10 transcript of it?

11 A   Not a final transcript.  We have a transcript, yes.

12 Q   Oh, you have a recording of it?

13 A   Yes.

14 Q   Okay.  And you've made a transcript, but it has yet to be

15 verified?

16 A   Yes.

17 Q   Okay.  In that, have you listened to that call?

18 A   Yes.

19 Q   Were you present with her when the call was made?

20 A   No.

21 Q   Okay.  In that call, did Miss D ask Nevine why she was

22 giving her those names?

23 A   Yes.

24 Q   Did Miss, did Nevine say that she knew?

25 A   She said she didn't know.

1  Q    And she had no idea why she was supposed to give those

2  names?

3            MR. SEVERO:  Objection, Your Honor.

4            THE COURT:  I'm sorry?

5            MR. SEVERO:  I object to the, that, the phrasing of

6  that question.

7            THE COURT:  Repeat the question.

8            MR. SWIFT:  I asked so she had no idea?

9            THE WITNESS:  She said she didn't know.

10           THE COURT:  Objection overruled.

11  BY MR. SWIFT:

12  Q    Now, in fact, you listened, you testified about a lot of

13  phone calls that you'd listened to, correct?

14  A    Yes.

15  Q    And in some of -- one -- at least one of those phone calls

16  you did listen to the defendant and Sherifi talk about

17  violence, didn't you?

18  A    Early, yes.

19  Q    And when she talked about the legal justifications,

20  perhaps, for jihad, fighting in his own country or something

21  like that, correct?

22  A    I don't know the exact context, but they were talking about

23  violence against others.

24  Q    And, and she was against it?

25  A    Yes, at that time.

1   Q   Absolutely.  She said it was against God?

2           MR. SEVERO:  Objection, Your Honor, to testifying.

3           THE COURT:  Overruled.

4           THE WITNESS:  No.  I don't know what she said exactly.

5   She was against the violence, yes.

6   BY MR. SWIFT:

7   Q   Okay.  On -- prior to the January 2nd meeting, did the

8   defendant visit with Sherifi on December 31st?

9   A   Yes.

10  Q   Okay.  In that one did the, was that where she was directed

11  to go pick up things from Scobin and from Miss D?

12  A   On the 31st?

13  Q   On the 31st.  Did she receive directions on what to do?

14  A   I don't recall.

15  Q   Well, from your investigation, did she meet on January 2nd

16  with Scobin at her own initiative or was she directed to do

17  that, if you know?

18  A   I don't know.

19  Q   Now on January 2nd, going to that date, after she'd met

20  with Miss D, she went into the Hanover Detention Facility?

21  A   Yes.

22  Q   Did the -- during the course of the conversation you heard

23  writing or indicated that writing was being, taking place, is

24  that correct?

25  A   Yes.

1  Q    Now you were able to, you were recording the, what, you had

2  a monitor in there that you were recording, correct?

3  A    Audio, yes.

4  Q    Audio.  Were you able to take video?

5  A    No.

6  Q    So you weren't able to see what the notes were?

7  A    No.

8  Q    Did you ask when you interviewed her, the defendant, about

9  whether she, what was in the notes?

10 A    Yes.

11 Q    Did she indicate that they were in her notebook?

12 A    She indicated that they would be in her car.

13 Q    Okay. That she had a notebook in the car, is that correct?

14 A    She indicated they'd be in her car.

15 Q    Did you find a notebook in her car?  Have you searched --

16 are you aware whether the FBI searched her car?

17 A    Yes.

18 Q    Did you find a notebook?

19 A    There was a notebook.

20 Q    Did you go through the notebook?

21 A    Yes.

22 Q    Did you find any notes in there?

23 A    There were a lot of notes in that notebook.

24 Q    Were any of the notes words to the effect of, "Are you

25 getting me in trouble," or something like that?

1   A    Not that I can recall.

2   Q    Was there anything in the part that says, "Is this illegal?

3   Are you putting me in danger?"

4   A    Not that I can recall.

5   Q    Did you find anything that you thought might have been

6   notes from that day?

7   A    I don't recall.

8   Q    But you do have the notebook?

9   A    We have the notebook, yes.

10  Q    Now with regards to the jewelry, did you listen to

11  conversations between Scobin and the defendant?  Did you have

12  the ability to have surveillance on the phone calls not made

13  from the prison?

14  A    No.

15  Q    Have you been able to obtain the e-mails between them or

16  text messages?

17  A    Not yet, no.

18  Q    Were you aware that there were discussions in that case

19  regarding the family's need for money?

20  A    Yes.

21  Q    Multiple discussions not having to do with these witnesses,

22  correct?

23  A    Yes.

24  Q    That they were supposed to supply -- they had lots of

25  debts, correct?

1   A    Yes.

2   Q    The father had cancer?

3   A    Yes.

4   Q    And, in fact, Sherifi was, asked the defendant for money

5   almost from the onset, didn't he?

6   A    Yes.

7   Q    And, and his indication was many needs of the family,

8   correct?

9   A    He indicated multiple needs for the money, not just his

10  family.

11  Q    Now this individual that you, those pictures shown to her

12  of one individual.  And that's a bad question.  Withdrawn.

13       On January 2nd, a picture was shown by Miss D to the

14  defendant?

15  A    Yes.

16  Q    That person had been a witness in this trial or -- excuse

17  me -- in the earlier trial?

18  A    The person in the photo?

19  Q    Yes.

20  A    Yes.

21  Q    Did that person reside in the State of North Carolina or

22  not?

23  A    Yes.

24  Q    To your knowledge, was the defendant ever shown any other

25  pictures of persons who didn't reside in the State of North

1  Carolina?

2  A    Photographs?

3  Q    Yes.

4  A    Not that I know of.

5  Q    During your investigation, you certainly uncovered evidence

6  that you've testified here today that the defendant acted as a

7  courier for Mr. Sherifi, correct?

8  A    "Acted as a courier"?  What do you mean?

9  Q    She ferried messages for him to and from the prison,

10  correct, or the Hanover Detention Facility?

11  A    She traveled with messages back and forth?

12  Q    Yes.

13  A    I'm not sure how to answer that.

14  Q    Well, she brought him a photo?

15  A    Yes.

16  Q    She took back a message regarding the photo?

17  A    Yes.

18  Q    She delivered money for him?

19  A    Yes.

20  Q    She met with Miss D?

21  A    Yes.

22  Q    She provided Miss D names?

23  A    Yes.

24  Q    All at his direction?

25  A    Yes.

1   Q    You never heard her express any animosity toward any of

2   these witnesses, did you?

3   A    I did.

4   Q    You did?  What animosities?

5   A    She in one phone call called informants "low lifes."

6   Q    When was that?

7   A    I cannot recall the exact date.

8   Q    Did she say they should be killed?

9   A    No.

10  Q    To your knowledge, did she play any role in the selection

11  process of who would be targeted other than delivering the

12  information?

13  A    No, I don't believe so.

14  Q    During that meeting on January 2nd, you've listened to the

15  trans, or to the transcript of it, is that correct?

16  A    Which --

17  Q    Well, excuse me.  The recording.

18  A    Which meeting?

19  Q    The meeting between Sherifi and Nevine, the prison visit.

20  A    I have listened to it, yes.

21  Q    During that, during the visit, do you hear her, him saying

22  to her words to the effect of, "You have to trust me and I'll

23  trust you," or words like that?

24  A    Yes.  He said that very closely after she said, "She was

25  talking too much."

1  Q    Did she ask what was she talking about?  Why was she saying

2  those things?

3  A    Did she ask Mr. Sherifi why she was saying things?

4  Q    Yes.

5  A    No.  She was mostly doing writing and having him look at

6  writing.

7  Q    You're sure she didn't say, "Why is she saying those

8  things?"

9  A    I'm sure.

10  Q    Okay.  Now on this last part where the photos of the, the,

11  photos that depicted that an execution or a killing had taken

12  place, those were -- when was Mr. Sherifi informed that those

13  photos existed?

14  A    I believe late on the evening of the 19th.

15  Q    Okay.  Now the defendant Nevine was scheduled to come visit

16  him on January 21st to pick up all these records, correct?

17  A    Yes.

18  Q    It's well known he, they had previously agreed on that?

19  A    Yes.

20  Q    And she had been able to bring a picture in without being

21  searched before, correct?

22  A    Yes.

23  Q    But he didn't want her bringing it in.  He didn't direct

24  that she bring it in?

25  A    He was advised the photo would be ready on Sunday, on the

1   22nd.

2   Q    Did he make any attempt to delay her visit?

3   A    I don't know.

4   Q    He had his brother bring in the photo, correct?

5   A    Yes.

6   Q    Is there any evidence that she ever saw the photo?

7   A    No.

8   Q    Is there any evidence that she made any decisions in this

9   plot, that she was the leader of this plot in any way?

10  A    Hysen Sherifi was the leader.  She assisted.

11  Q    At all stages she was instructed by Hysen Sherifi as to

12  what to do?

13  A    She was instructed numerous times what to do, yes.

14  Q    Is there any evidence whatsoever that absent having met

15  Hysen Sherifi that she would have come up with an independent

16  plan to take action against --

17            MR. SEVERO:  Objection.

18  BY MR. SWIFT:

19  Q    -- any witnesses --

20            MR. SEVERO:  I'm sorry.  Go ahead.  Finish.

21  BY MR. SWIFT:

22  Q    -- against any witnesses in the previous case?

23            MR. SEVERO:  Object, Your Honor.

24            THE COURT:  Overruled.

25            THE WITNESS:  I don't think so.

1          MR. SWIFT:  I have no further questions.

2    BY MR. SWIFT:

3    Q    Thank you.

4          MR. SEVERO:  One moment, Your Honor.

5        (Pause)

6          MR. SEVERO:  Nothing further, Your Honor.

7    BY THE COURT:

8    Q    I had a question, Agent, with respect to the, to the note

9    that was exchanged in the automobile with CS 2.  I think the

10   note said, "Pic confirmed," is that correct?

11   A    Yes.

12   Q    And that was contained in a, in a dominoes box?

13   A    It was given to CS 2, the note was.  The box was given by

14   Ms. Elshiekh.  In the box were dominoes and an envelope of

15   money.  She then wrote on the note, "Pic confirmed" on the

16   back.

17   Q    Okay.  My -- the, the, the, the direction of my question

18   was going to be who wrote the note.

19   A    Ms. Elshiekh.

20   Q    Okay.  And you know that because?

21   A    She wrote it in the presence of CS 2.

22   Q    Okay.

23          THE COURT:  Are there any further questions from

24   counsel with respect to this witness?

25          MR. SWIFT:  Uh --

 1              THE COURT:  Go ahead.

 2   BY MR. SWIFT:

 3   Q   In light of your, in light of those questions, were you

 4   able to monitor or listen to the conversation that was

 5   occurring inside the car?

 6   A   Yes.

 7   Q   So you were able to hear that despite the fact that it was

 8   happening inside the car, is that correct?

 9   A   I'm confused by your question.

10   Q   You, you were able to record all things that were said

11   inside that car?

12   A   Yes.

13              MR. SWIFT:  No further questions.

14              THE COURT:  Mr. Severo?

15              MR. SEVERO:  No, nothing further, Your Honor.

16              THE COURT:  Thank you, Agent.  You can step down.

17              THE WITNESS:  Thank you.

18              THE COURT:  Is there anything further from the

19   Government with respect to probable cause?

20              MR. SEVERO:  No, Your Honor.

21              THE COURT:  Is there anything from the defendant with

22   respect to probable cause?

23              MR. SWIFT:  Nothing further, Your Honor.

24              THE COURT:  Okay.  Now, Mr. Swift, are you, are you

25   prepared at this time to produce witnesses with respect to the

1    detention hearing?

2            MR. SWIFT:  We are.

3            THE COURT:  Okay.  Would you like to -- I really don't

4    have a preference as to who goes first.

5            Does the Government have any witnesses with respect to

6    detention other than the testimony, I assume, you would rely on

7    from the agent?

8            MR. SEVERO:  Yes, Your Honor.  May I have just one

9    moment to ask a question?

10        (Pause)

11           MR. SEVERO:  Your Honor, we wouldn't be presenting any

12   evidence with respect to detention at this time --

13           THE COURT:  Okay.

14           MR. SEVERO:  -- except, I think, as previously has

15   been discussed about the Pretrial report.

16           THE COURT:  Okay.  Now we'll get -- I don't know if

17   now is a, is a, the best way to discuss the Pretrial report.  I

18   usually do it after the showing by the parties and ask if

19   there's anything in the Pretrial report that they want --

20           MR. SEVERO:  Well, then, we'll wait until that time,

21   Your Honor.

22           THE COURT:  Okay.

23           MS. MORENO:  We would prefer that, Your Honor.

24           THE COURT:  Okay.

25           MS. MORENO:  Thank you.

1      THE COURT:  Are you prepared at this time to put on

2  witnesses for detention?

3      MS. MORENO:  Your Honor, as, as I indicated before, we

4  could do that.  I wanted to proffer first but if the Court

5  would like to hear from the witness --

6      THE COURT:  However, however you wish to proceed.

7      Is there any objection from the Government about,

8  about proffers?

9      MR. SEVERO:  No, Your Honor.

10      THE COURT:  Okay.

11      However you wish to proceed, Ms. Moreno.

12      MS. MORENO:  Thank you, Your Honor.

13      If, if it please the Court, I'm going to proffer based

14  on the nearly 50 character letters that the Court, hopefully,

15  has reviewed.

16      THE COURT:  Yes, ma'am.

17      MS. MORENO:  And if I may approach, I have marked as

18  Defendant's Exhibit 1 Ms. Elshiekh's resumé, a copy of which

19  has already been provided to the Government, and we would like

20  the Court to review that as well, if I --

21      THE COURT:  All right.

22      MS. MORENO:  -- may approach.

23      THE COURT:  Any objection from the Government?

24      MR. SEVERO:  No, Your Honor.

25      THE COURT:  Would the, would the defense want to move

1    into as exhibits the letters that I've, I received?

2            MS. MORENO:  Defense Exhibit 1.

3            THE COURT:  And how about Defense Exhibit 2, is the

4    letters that you proffered, or you provided to the Court?

5            MS. MORENO:  Thank you so much.

6            THE COURT:  Any objection from the Government with

7    respect to the letters?

8            MR. SEVERO:  No, Your Honor.

9            THE COURT:  Okay.

10           MR. SEVERO:  I guess they'll have to comply with the

11   Rule about -- I'm sure there's certain information in --

12           THE COURT:  Right, right.

13           MS. MORENO:  Which is one of the reasons we didn't

14   file them before.

15           THE COURT:  Correct.

16           MS. MORENO:  Thank you.

17           THE COURT:  Thank you.

18           MS. MORENO:  Your Honor, may I stand?

19           THE COURT:  Yes, ma'am.

20           MS. MORENO:  Thank you.

21           And with respect to those letters, Your Honor, I would

22   expect the Court to put them under seal subject to redaction.

23   Would that be the Court's preference?

24           THE COURT:  How do we do --

25       (Court confers with staff)

1          THE COURT:  The usual course, I'm told, is, is that

2   while the exhibit list will be part of the docket and available

3   for public viewing, the actual exhibits will not be.

4          MS. MORENO:  Thank you, Your Honor.

5          Your Honor, I'm going to --

6          THE COURT:  All right.

7          Go ahead, I'm sorry.

8          MS. MORENO:  Thank you.

9          I'm going to first talk about Ms. Elshiekh's character

10  as expressed from the community, which within a week produced

11  50, almost 50 character letters from a diverse array of people.

12  We're asking the Court to take a step back now from the

13  preliminary hearing and look at Ms. Elshiekh in the context of,

14  of course, under the Bail Reform Act, a danger to the community

15  and a flight risk, acknowledging that the Government has no

16  presumption in this case.

17         The letters portray a person who is a selfless,

18  compassionate humanitarian committed to the education of

19  autistic children, of special education children.  If the Court

20  looks at Ms. Elshiekh's resumé, she was currently employed at

21  the Sterling Montessori Academy as a special ed teacher upon

22  her arrest and had been so employed for the previous nine

23  years.  The letters, again which are written from diverse

24  sources, including fellow teachers, students who had her when

25  they were in the second grade, Rhodes scholars, professor

1  emerituses, all attest to the character of Nevine Elshiekh as a

2  peaceful, compassionate person of the utmost integrity, a

3  person who works with troubled youth, a person who works at

4  diverse, inter-faith forums with the Lutheran Church, with food

5  programs, a person who I believe when I was thinking about what

6  compassion really means I looked at Plato and Plato said, "Be

7  kind for everyone you meet is fighting a harder battle," and I

8  believe that Nevine Elshiekh took that to heart.  The letters

9  attest to her personal kindness and mentoring not only

10 children, but mentoring other teachers, working with the

11 disabled, a person who was environmentally conscious and making

12 her mosque go green.  I actually had never heard that before.

13         Her importance and significance to the community,

14 which is something we urge the Court to consider, is a

15 community where she's been living for the last 44 years.

16 Ms. Elshiekh is an American citizen and as both the, her resumé

17 and the probation report attest, she has lived in this

18 community for 44 years.  She's employed.  She owns property

19 here and you're going to hear from her father in a moment, Your

20 Honor, with respect to those issues.

21         She takes care of her parents and has been living with

22 them and attending to their needs and helping them.  This is

23 someone who poses absolutely no danger to the community and is

24 no flight risk and we would say that while apparently in the

25 probation report it is indicated that the FBI did not find her

1  passport, we certainly would be willing to surrender it upon

2  finding it, ourselves.

3  A review of Ms. Elshiekh's resumé, Your Honor, just

4  shows a profound depth of commitment to the community from the

5  most basic level.  But overriding all of that, let us not

6  forget that she is a teacher and a teacher of the most fragile

7  children who even in previous years have come forward to write

8  letters and attest to her integrity and to her character.  In

9  no manner from those who've known her, from friends who have

10  just met her and have known her for a few years to persons who

11  wrote on her behalf who've known her for the last 40 years is

12  there any shred of evidence that Nevine Elshiekh poses a danger

13  to the community or would not live up to the obligations of

14  being in court when she was supposed to be in court.

15  With respect to giving assurances to the Court

16  regarding releasing Ms. Elshiekh, I would like to call up --

17  first, I would like to acknowledge to the Court that

18  Ms. Elshiekh has numerous family members in the court,

19  including her father, her mother, her sister, and cousins.

20  And I would like to bring to the Court's attention

21  Dr. Aly Elshiekh, who is Ms. Nevine Elshiekh's father and with

22  whom she has been living with.  And before he comes to the

23  stand, I would proffer to the Court as follows:  That

24  Dr. Elshiekh is a professor emeritus from North Carolina State.

25  He has three degrees from MIT, including a Ph.D. in mechanical

 1  engineering.  He has been an American citizen since 1974.  He's

 2  married 54 years to his wife with whom he resides and with whom

 3  Nevine resides.  He taught at North Carolina State from 1968 to

 4  2000 and his career span teaching nearly 5,000 students and

 5  graduating about 30 Ph.D.s.  Her father is a pivotal member of

 6  the community, one of the first, Your Honor, to work on the

 7  vehicle to go to Mars, the Mars Mission Research Center.  His

 8  resumé is 11 pages long, but I think the Court will want to

 9  hear from Dr. Elshiekh, who will assure the Court that if

10  released into his custody Nevine will make all of the court

11  appearances, will pose no danger whatsoever to the Court.

12              If I may bring him forward.

13              THE COURT:  Yes, ma'am..

14              MS. MORENO:  And does the Court wish him to take the

15  stand, or can he sit here?  How --

16              THE COURT:  Take the stand and --

17              MS. MORENO:  And be sworn?

18              THE COURT:  -- be sworn and testify.

19              THE COURTROOM DEPUTY:  State your name.

20              DR. ELSHIEKH:  My name is Aly Elshiekh, and I am a

21  professor emeritus from North Carolina State University.  And

22  I'm 80 years old.

23              DR. ALY ELSHIEKH, DEFENSE WITNESS, SWORN

24              THE COURTROOM DEPUTY:  You may take the witness stand.

25              MS. MORENO:  May it please the Court?

1          THE COURT:  Yes, ma'am.

2                         DIRECT EXAMINATION

3    BY MS. MORENO:

4    Q    Dr. Elshiekh, good morning.

5    A    Good morning.

6    Q    And you are Nevine's father?

7    A    Yes, ma'am.

8    Q    Was there anything I left out in your illustrious resumé

9    that you would want the Court to know about you personally,

10   sir?

11   A    I think the, what you left, what I left also from my resumé

12   is the work which I did behind the scene through my advisees,

13   who I advise every year, and the people who I, whom I corrected

14   their pasts to go back to life.  I had student who were on

15   drugs, who were alcoholic.  Later on, when they graduated they

16   had problem with their lives and they brought me in to solve

17   this problem to them and I did at least, every year I taught at

18   State I had two or three students of that nature whom I brought

19   them to be productive and now they are first-class citizen

20   working for this country to make it as good as it is now.

21   Q    And, Dr. Elshiekh, you became a citizen when?

22   A    In 1974.

23   Q    And you decided to stay in this country why, sir?

24   A    Well, let me tell you a little story here, if, if Your

25   Honor will permit me to do so.

1       When I came to, to North Carolina State University after

2   graduating at MIT back in '65, 1965, I had a commitment to work

3   some for the Egyptian Government because Egyptian Government

4   was the one who gave me a scholarship to come and study in, in

5   the U. S.  And actually, before that, they first send me to

6   Russia and then I hated it so much that I, that I didn't stay

7   but eight months there and then I came, I transferred my, my

8   scholarship to, to the State and went to MIT and graduated and

9   left to Egypt.  Stayed three years and then I was invited by

10  North Carolina State to come as a visiting lecturer.

11      When I got my citizenship I had two choices.  North

12  Carolina State wanted me and they (indiscernible) what exam

13  they had wanted me.  And I had to weigh the situation.  Both

14  sides, the work was good, but I chose and, by the way, the,

15  the, the decision was my wife and I only.  The kids were very

16  young.  Nina was 12 and Nevine was about 7.

17      So the decision was us and one of the most weighing factors

18  to make us make our mind is that our love for the American

19  dream, our love for the judicial system of this country.  We

20  trusted it.  We didn't trust it back in Egypt.  At that time

21  there was no way to, to really set, be free, okay?  We liked

22  the freedom which we enjoyed in this country, we liked the

23  democratic system which are running this country, and really,

24  one of the way is that we had, really, a truly free society and

25  a truly judicial system.

1  Q    Let me ask you this:  So now your daughter is in the throes

2  of the American judicial system.

3  A    Yes, ma'am.

4  Q    And what the Court wants to know is what your faithfulness

5  and loyalty still is to the system that now your, your daughter

6  is caught up with?

7  A    I am very -- I trust the system a hundred percent --

8  Q    Okay.

9  A    -- maybe 110 percent --

10  Q    Okay.

11  A    -- okay?  I know that the system would be fair to her.  If

12  she did wrong, she will be judged for that.  If she was conned,

13  I hope the system will take care of that, will take that in

14  consideration, and I am pretty sure that she will see her fair

15  day in the court.

16  Q    And if the Court releases Nevine into your custody, would

17  she go back to your home?

18  A    She would come back to my home and I'll be a hundred

19  percent responsible for her to make her appearances whenever

20  she's needed, anyplace she's needed.

21  Q    Okay.  And do you have any doubt about that, whatsoever?

22  A    I have no doubt, whatsoever.

23  Q    And if the Court decides that there might be some

24  conditions of bail that are appropriate in this case, are you

25  prepared to offer that as well to the Court and could you

1  explain to the Court what that is?

2  A    Well, we have a -- we, we were fortunate working in the

3  U. S., okay?  I didn't make any money during teaching, but I

4  did it helping the industry and consulting and then in

5  courtrooms as a professional witness and so on and so forth.

6      We have a house on Emerald Isle, North Carolina, which we

7  pay taxes for, for close for a million dollar and would be --

8  and it has no loan on it, no collateral loans on it -- and I

9  would be glad to put that right upfront.

10  Q    To assure your --

11  A    To assure that, that we, we will abide by whatever the

12  Court deems.

13          MS. MORENO:  May I have a moment, Your Honor?

14          THE COURT:  Yes, ma'am.

15      (Pause)

16  BY MS. MORENO:

17  Q    If you find out -- if you can -- if you find Nevine's

18  passport anywhere, can you assure the Court that you would

19  immediately either turn it over to the lawyers or turn it into

20  the Court?

21  A    Well, they show the passport was mentioned two times since

22  I came back from Egypt because I came after this whole

23  situation occurred and my daughter, my older daughter, told me

24  that someone from the FBI took the passport.

25  Q    Okay.  So you don't have any --

 1  A    But if we find it, okay, I'll be delighted to surrender it

 2  to anybody, to any authority who will deem, okay, and I will be

 3  responsible that Nevine will never leave the country --

 4  Q    Okay.

 5  A    -- without court permission.

 6  Q    Okay.  Excuse me.

 7       Thank you so much, Dr. Elshiekh.  I don't know if the

 8  Government has any questions.

 9            THE COURT:  Mr. Severo?

10            MR. SEVERO: Just several.

11                        CROSS-EXAMINATION

12  BY  MR. SEVERO:

13  Q    Doctor, was she live, was Nevine living at your house in

14  Novem, in October --

15  A    Yes.

16  Q    -- to the time of her arrest?

17  A    Yes.

18  Q    And she wasn't living anywhere else, just there, is that

19  correct?

20  A    Yes.

21  Q    All right.  And in your home do you have a computer?

22  A    I have, well, I have three.  I have my personal computer

23  and she had a couple of computer and all of them was taken by

24  the FBI.

25  Q    Okay.  And access to a phone?

1  A    Yes.  We have a few iPhones were taken, were taken also by,

2  by the system.

3  Q    And --

4  A    That's my understanding.  I was not here.

5  Q    Yes, sir.

6       And when -- you mentioned that you went on, you were on a

7  trip to Egypt, is that what you --

8  A    Yes.

9  Q    And do you have family in Egypt?

10 A    I have cousins and nephews.  I don't have any sisters or

11 brother.  They all passed away.

12 Q    Okay.  And you went over there, I assuming, to visit them?

13 A    I went to give a couple of lectures at the Institute of

14 Higher Education.

15 Q    All right.  Did you stay with --

16 A    And I visited, I visited my, my, my relatives, or they came

17 and visited me.

18 Q    Okay.  And since Nevine has been arrested have you spoken

19 with her?

20 A    I spoke with her on the phone a couple of times --

21 Q    Okay.

22 A    -- and I --

23 Q    Did --

24 A    -- visited her yesterday at the Hanover --

25 Q    I'm sorry.

 1  A    -- County Detention Center.

 2  Q    Okay.  And did you speak with her?  You said --

 3  A    In general terms, yes.

 4  Q    Did you ask her why she had been charged with murdering to

 5  hire someone?

 6  A    I never did.

 7  Q    You never did?

 8  A    No.

 9  Q    Did you not want to find out what --

10  A    I didn't want to speak about the case until I hear.  I

11  would probably discuss it now freely since I know what's, since

12  I heard the Government side.

13  Q    Who else lives in your home besides yourself, sir?

14  A    My wife and I --

15  Q    And --

16  A    -- and Nevine.  And two pets.

17  Q    Two pets?

18       And --

19            MR. SEVERO:  May I have one second, Your Honor?

20            THE COURT:  Yes.

21       (Pause)

22  BY MR. SEVERO:

23  Q    If I understand correctly, Doctor, you all have an

24  apartment over in Egypt?

25  A    Yes.

1  Q    And Nevine was over in Egypt in the summer, is that right?

2  A    Was there for two weeks.  She was going to attend a

3  wedding.

4  Q    Okay.  And was that a family wedding?

5  A    Yes.

6  Q    And she went to that, didn't she?

7  A    She went there.  She did not stay in the apartment because

8  it's under construction.

9  Q    Did she stay with family?  She stayed with family?

10  A    She stayed with family.

11          MR. SEVERO:  One more moment, Your Honor.  I

12  apologize.

13      (Pause)

14          MR. SEVERO:  Nothing further, Your Honor.

15          MS. MORENO:  May I?  May I just briefly, Your Honor?

16          THE COURT:  Sure.

17                      REDIRECT EXAMINATION

18  BY MS. MORENO:

19  Q    Would you be willing to have your phone communications and

20  your Internet communications monitored while Nevine stays with

21  you?

22  A    Yes.

23          MS. MORENO: Nothing further.

24  BY THE COURT:

25  Q    Doctor, has anyone spoken to you about the obligations of

1  being a third-party custodian?

2  A    No.

3  Q    Okay.  Do you have a land line in, in your home?

4  A    Yes.

5  Q    And tell me, are you employed currently?

6  A    Right now, I have a restaurant.  I'm running a restaurant

7  in Raleigh.

8  Q    Tell me what your work hours are insofar as how, how often

9  during the week you are outside the home.

10  A    The restaurant is about five minutes away from the house

11  and assuming that if Nevine was given to my custody, the, the

12  Court will allow her to go back to work where she misses her

13  kids and the kids also misses her, her students, special

14  education, and if needed, I will go stay with her and I, in the

15  school.  I will guard her 24 hours.

16  Q    Sure.  But, but in the home, who is home during the day and

17  how often --

18  A    My wife.

19  Q    And she's there all day?

20  A    All the time.  My wife is a homemaker, nothing, nothing

21  else.

22  Q    And it's you that's running the restaurant?

23  A    I am the one who's running the restaurant.

24  Q    Are there any firearms in the home?

25  A    No, never owned a firearm.  Never shot a gun or a pistol.

1          THE COURT:  All right.  Is there any further

2   questioning?

3          MR. SEVERO:  Just two, briefly.

4                        RECROSS EXAMINATION

5   BY MR. SEVERO:

6   Q   Does your wife work at the restaurant some, too?

7   A   A little bit.

8   Q   And all the times that you've mentioned that your wife was

9   home, she would have been home those times in December and

10  January of 2012?

11  A   Yes.

12         MR. SEVERO:  Nothing further, Your Honor.

13         THE COURT:  Ms. Moreno or Mr. Swift?

14         MS. MORENO:  Your Honor --

15         MR. SWIFT:  No, Your Honor.

16         MS. MORENO:  Well, Mr. Swift is going to argue, Your

17  Honor.

18         THE COURT:  Okay.

19         Whoever wants to lead off, then, in closing arguments.

20         MS. MORENO:  May we -- may Dr. Elshiekh return to his

21  seat?

22         THE COURT:  Yes, I'm sorry.

23         You may step down.

24         THE WITNESS:  Thank you, Your Honor.

25         THE COURT:  Thank you.

1          MR. SWIFT:  If it please this Court:

2          THE COURT:  Yes, sir.

3          MR. SWIFT:  I'm going to address, generally, the

4    factors in 18 U.S.C. 13 -- 3142 --

5          THE COURT:  Okay.

6          MR. SWIFT:  -- beginning with an outline and I'll

7    agree the Court, or start with that.

8          The Court has one of, I believe, three decisions.  I

9    don't believe the temporary detention is at all at issue here

10   as one of the three, as one of the four options.  There is no

11   cause for temporary detention.

12         So we have options for the Court to release on

13   personal recognizance or upon execution of an unsecured

14   appearance bond, or to release on condition or combination of

15   conditions under Subsection (c) of the, of the statute or to

16   detain under Subsection (e).

17         Start with in this case, this is not one of those

18   cases, although I think sometimes people think that this

19   particular crime would be when, where the Government gets a

20   rebuttable presumption that detention is necessary in this

21   case.  In fact, and I will be handing the case up because I

22   think it, it's helpful to the Court --

23         THE COURT:  I may already have this.  I think I know

24   where you're going, where the --

25         MR. SWIFT:  Louisiana case?

1          THE COURT:  Got it.

2          MR. SWIFT:  You got it, too.

3          THE COURT:  Yeah.  In fact, yeah.  It's --

4          MR. SWIFT:  So --

5          THE COURT:  The, the comment from counsel is --

6          MR. SWIFT:  United --

7          THE COURT:  -- "Well, it should be a presumption

8   case," and then the Court says, "Congress speak" --

9          MR. SWIFT:  That --

10          THE COURT:  -- "and they are supposed to speak and

11  they didn't speak."

12          MR. SWIFT:  And they didn't.  That's exactly the

13  comment of the court.

14          So that brings us next -- and I appreciate your

15  having, your careful consideration even prior to this hearing

16  and thinking it through.  Clear -- the, the, the standard here,

17  we have two questions.  The first question is, in this one, in

18  seeking pre-trial detention the Government then has the burden

19  and they have to establish risk of flight by a preponderance of

20  the evidence and dangerousness to the community by clear and

21  convincing evidence.

22          The Supreme Court has said that clear and convincing

23  evidence is defined as "evidence which produces in the mind of

24  Your Honor a firm belief or conviction as to the truth of the

25  allegations sought to be established, evidence so clear, direct

1   weighty, and convincing as to enable the finder of fact to come

2   to a clear conviction, without hesitancy, of the truth of the

3   precise facts at issue."  And that's from Cruzan versus

4   Director of Missouri Department of Health, 497 U.S. 261, and

5   the quote's from 285, decided in 1990.

6           And I'll direct my first part to dangerousness to the

7   community.  In this particular case, I think not only the

8   charge, which the probation officer seemed to take into

9   account, but nothing more on that, it is a serious crime.  It

10  is a crime of violence.  It's been defined as such and it is a

11  serious crime.  However, in evaluating future dangerousness in

12  this one, the Court needs to take a look at the role of the

13  defendant in this crime.

14          This is a conspiracy crime, which involve multiple

15  parties, and we're not here today and we're not going to be

16  arguing whether there's a presumption in this part, but we're

17  not here today to decide, as Your Honor pointed out, whether

18  she's guilty or innocent.  But what we do have in the role in

19  this is, as the agent testified, what she did -- whether it's

20  knowing or unknowing will be established sometime in the future

21  -- but what she did was at the direction of Mr. Sherifi, Hysen

22  Sherifi.  She didn't have any role in picking who would be

23  attacked.  She didn't have any role in deciding the

24  methodology.  She had no role in selecting the people.  She had

25  no role other than to take money and information to different

1  people.  In fact, if we remove Hysen Sherifi from the

2  conspiracy, there's no evidence that there ever would have been

3  a conspiracy.

4        And so in looking at clear and convincing evidence,

5  Your Honor, that there's a future risk based on this crime, one

6  has to -- the only way to suppose that she will pose a threat

7  is that he can now re-engage with her because that's what, for

8  instance, put together the chemicals that the Government

9  alleges was this potential bomb.  It's an essential element.

10  Without it, there's no clear and convincing evidence that she

11  would commit a future crime or pose a future danger.  And

12  that's what we're looking at here today, not is she guilty

13  because we're not about pre-trial punishment.  We're about

14  future dangerousness or dangerousness to the community.  And

15  absent his participation, her role in this case does not

16  indicate that she would execute a threat.

17        Moreover, there's some, certainly, conditions on

18  ability to communicate that this Court can put in place to

19  prevent any communication.  It can direct on pain of forfeiture

20  that she's not to contact any witness, that she's not to have

21  any contact with parties who've been involved in the past

22  cases, that she's not to have or even more restrictive conduct

23  and you have to find by clear and convincing evidence that that

24  would not be sufficient.

25        Additionally, her father has stood as surety for these

1 things and he is willing to put up -- and I think that this is

2 important -- because as conditions he's willing to put up his

3 home of considerable value to guarantee not only her presence,

4 but her compliance with this Court's conditions, whatever those

5 may be.

6 And, in fact, looking at those same sort of factors in

7 the Lafayette case, the court found that at least for one of

8 the defendants, or, actually, for both of the defendants, that

9 there was no clear and convincing evidence despite, arguably,

10 far more involvement in the crime by both defendants than

11 Ms. Sherifi or -- excuse me -- Ms. Elshiekh in this case, that

12 there was not clear and convincing evidence of a potential to

13 commit further misconduct or be a threat to the community.

14 Now we move to the second part, flight. The

15 Government in addressing -- and I anticipate that we're going

16 to talk some about flight. I think the most important thing

17 for this Court to consider in this is technology has given Your

18 Honor a great many more options these days than even existed in

19 1997. The GPS monitor has proven itself to be extraordinarily

20 a factor.

21 In this case, in order to go to any contacts outside

22 the United States it is absolutely required that the defendant

23 board an airplane or a ship and travel across the ocean. A GPS

24 monitor that monitors when you leave the home would

25 immediately, along with a house and surety, assure the Court of

1    her presence.  In fact, she is a lifetime citizen of this

2    country, has extraordinary ties to the community, and has no

3    criminal history.

4          Given all of those factors, there is no way that the

5    Government can show by a preponderance of the evidence that she

6    would not be present for each hearing.  What they're -- their

7    argument is she has traveled abroad, that she has family

8    abroad.  Under that standard, under preponderance of an

9    evidence, that would mean that any defendant that had family

10   overseas is simply held over and that's not appropriate and not

11   what Congress considered.  And in this particular case there

12   are easily factors that the Court can utilize to hold her under

13   conditions and those same factors can be utilized to address

14   each of the concerns about future dangerousness in a tailored

15   order that permits her to be with her parents while trial is

16   pending.

17         Thank you, Your Honor.

18         THE COURT:  Thank you.

19         All right, Mr. Severo.

20         MR. SEVERO:  Your Honor, I would start off by saying

21   there is strong evidence of this, in this case of her role.

22   When defense counsel says that she didn't do much, she just

23   took the picture to the people and got it confirmed, to start

24   with, and then paid the money that started all this.  When

25   defense counsel talks about that the threat has been

1   eliminated, the fact that she would act as a conduit, we

2   contend, makes her more dangerous in the fact that she still

3   would be able, if out, to be a conduit.

4          The -- in this case, this was not a completed crime.

5   Those witnesses are still available to be killed and the desire

6   on the part of these parties to kill them is just as strong, if

7   not stronger.  You start with the pending appeal.  You start

8   with the trial of the co-defendant.  And so that still exists

9   and the fact that this, it's now been revealed to them that one

10  of the people in here took part in this case.

11         So they, again, have a strong motivation to eliminate

12  that person.

13         Additionally, Your Honor, in this case not only do you

14  have those people who are still at risk, you now have two other

15  people who are at risk and through the course of discovery and

16  investigation and stuff, they're going to get all of the names

17  and addresses of those.

18         One of the things, also, Your Honor, in this case,

19  this defendant used all of the social mediums available to take

20  part in this conspiracy, the Internet, Twitter, telephone,

21  mail, and the Court.  I would contend, there's no appropriate

22  person to monitor.  The fact that she uses, she even used

23  those, are a part of the discussion about pawning the things

24  that raised the $5,000 to complete the, to the complete the

25  payment.  She conducted one of those conversations while at

1  work in the school.

2       Again, Your Honor, she used -- and this is no besmirch

3  of her family -- but she felt comfortable using her residence

4  and taking part in this conspiracy at her residence.  The day

5  that she drives down to take the photographs and give the

6  money, she leaves from her house.  Returns to her house.  Meets

7  in a coffee shop in a public place with a co-conspirator to

8  exchange the items that are going to be pawned for the

9  additional money.  Receives the additional money.

10      So she's willing to engage out in the public,

11  additionally, Your Honor.  And then the letters and one of the

12  letters that involved the Twitter page was mailed from her

13  home.

14      So I would contend, Your Honor, that, that, first off,

15  that her father's not an appropriate third-party custodian but

16  if, because of his inability to be able to monitor all of those

17  different mediums, which she employed during all of this and

18  would continue to have access to employ the impossible.  And

19  it's no -- it should be no comfort to the fact that Mr. Sherifi

20  is incarcerated because she was able to do all of this besides

21  that and finding ways to do three-way calls, change of PIN

22  numbers, mail that was sent outside of the traditional jail

23  facility, meeting with third parties.

24      THE COURT:  How, how does that savviness with social

25  media manifest itself into being a, a danger that's something,

1   something this Court should be concerned about if, if she is

2   released?

3        MR. SEVERO:  Your Honor, she used those mediums to

4   further this conspiracy and so, therefore, and -- on -- she

5   would be able to use those same mediums to further a -- addi --

6   puts those people in danger because she used those same mediums

7   and being able to use those same mediums to further, further

8   harm to each and every one of these witnesses.

9        THE COURT:  I understand from Dr. Elshiekh's

10   testimony, however, that, that many of those mediums have been

11   removed from the home, is that correct?

12        MR. SEVERO:  They, they may have been removed.  I

13   don't know if they've acquired them, again, but you, the Court

14   would have to impose, then, the home would have no telephone,

15   no computer, no Internet, and then, further, the Court would

16   have to impose that her work would have no phone, no computer,

17   no Internet, and then, further, the Court would have to impose

18   that she doesn't go to anyplace, like a coffee shop, and

19   further, the Court would have to impose that she doesn't go to

20   anyplace that has a phone, an Internet, or a computer.

21        And -- and yeah.  Then you'd have to impose a list of

22   third-party people who wouldn't be able to meet with her like

23   this other co-defendant did and then the party, the Court would

24   have to impose a condition that she couldn't use the mail or

25   receive any mail and the Court would have to impose that --

1      THE COURT:  Why, why would I, why would I have to

2   impose a condition like that against her?

3      MR. SEVERO:  Well, Your Honor, I would contend to the

4   Court to ensure that she wouldn't be able to use any of those

5   mediums to further facilitate this crime.  Because, because

6   this is not a completed event.  Those witnesses are still

7   available to be killed.  They haven't been killed.  So they're

8   still witnesses, still witnesses that the parties want killed.

9   And now, not only do you have those witnesses, but you have two

10  more witnesses for the parties to want to kill.

11     Your Honor, as it relates to risk of flight, this

12  defendant was recently in a foreign country, stayed there for a

13  period of time, stayed with family.  And it's not simply that

14  anybody who has any contact.  It's the ability to be able to

15  stay long periods of time with a family.

16     Additionally, the person that they would offer as a

17  third-party custodian had been there and spent a good deal of

18  time in there.

19     And so the Government would contend that she has

20  strong ties to a outside country and additionally, has had

21  recent contact with that place, being as recent as this summer.

22     THE COURT:  But to Mr. Swift's point, you don't

23  contend that simply because she's traveled internationally

24  that, that that alone is dispositive to the risk of flight

25  issue?

1          MR. SEVERO:  No.

2          THE COURT:  In that, in that case, we would all be, be

3    under some form of restriction.

4          MR. SEVERO:  No, I would -- yes, Your Honor.  I would

5    not concede that that alone would be sufficient, in conjunction

6    with all the other things.

7          Additionally, Your Honor, in this case, as the Court

8    knows, the defendant, the type of sentence that the defendant

9    is facing.  And I would contend to the Court that when one is

10   facing that type of sentence, especially one that is not

11   accustomed to the judicial, to being incarcerated, there is an

12   inherent risk of flight because of that.  As sad as it is to

13   say, some people become accustomed to incarceration and don't

14   mind it, but I would contend to the Court based upon the length

15   of the sentence and that, that that would again be a factor to

16   consider as it relates to risk of flight.

17         May I have just one moment, Your Honor?

18         THE COURT:  Yes, sir.

19     (Pause)

20         MR. SEVERO:  Nothing further, Your Honor.

21         MR. SWIFT:  Briefly --

22         THE COURT:  Yes, sir.

23         MR. SWIFT:  -- to address four points.

24         One, the important part is who the defendant could

25   contact or how she could actually do something in this great

1    hypothetical.  Although the Government hasn't proffered it, I

2    would suggest that the Court, before considering that she'll be

3    able to use any of these social mediums to contact the, any of

4    the defendants, that the lead is most likely under SAM, Special

5    Administrative Measure, with no contact, but it can easily be

6    directed that there will be no contact from her.

7         The other defendant, while incarcerated, simply there

8    could be an order not to have contact and there won't be

9    contact.

10        So those are easily fixed.

11        From her teaching and her background, she has no, even

12   if she were inclined -- we argue that she's not -- but even if

13   somehow she was magically inclined, who she would contact to

14   effect these crimes is, again, you know, I guess, you know,

15   those -- it's easy to run into hit men down at the local

16   elementary school in the Government's idea here, and who you

17   can just post a ad on Facebook and that'll come true, again

18   subject to monitoring.

19        So I don't think that there's any real threat there.

20        With regards to the argument, the Government's last

21   argument of facing a sentence, the Government turns, actually,

22   this one statutorily simply has no bases.  Actually, the Court

23   is supposed to consider that she has not committed a crime

24   before as a positive factor.  In the Government's world, that's

25   now a negative factor.  She hadn't committed a crime,

1   therefore, we should put her in pretrial.  That's amazing.

2          Under these circumstances, I think that the Court can

3   and will be able to form both assurances of her presence and

4   assurances of, that no further acts will be taken and I take,

5   in part, that there are extra -- that the Court's, in this

6   case, directions -- and I know that sometimes there's questions

7   on whether people will follow the Court's directions -- but in

8   this case where the Court gives an order, it can also force a

9   surety against that order.  Conditions of release aren't so --

10  a surety is forfeited not only based on not appearing for

11  trial.  The failure to follow conditions, as this Court is well

12  aware, may be cause for the forfeiture of a surety.  And here,

13  that would be an extraordinary blow to her family.  Her family

14  would be extraordinarily vigilant to protect the assets and to

15  ensure and her own moral requirements not to report.

16          So that in this particular case, there's a significant

17  ability to form, for this Court, conditions of release that

18  will provide protection and don't violate clear and convincing

19  evidence.

20          Does the Court have any questions for counsel?

21  Because I'd be happy to address them.

22          THE COURT:  No, sir.

23          MR. SWIFT:  Thank you.

24          MS. MORENO:  Thank you, Your Honor.

25          THE COURT:  Now I have heard arguments on detention.

1   I have not heard closing arguments on probable cause.

2        Do the parties wish to be heard any further with

3   respect to what's before the Court or --

4        MR. SWIFT:  We do not --

5        THE COURT:  Okay.

6        MR. SWIFT:  -- believe that it's necessary to argue

7   probable cause and for our argument, this is fine.  We submit

8   on it.

9        THE COURT:  Okay.

10        Mr. Severo?

11        MR. SEVERO:  Your Honor, I would contend there's very

12   strong evidence that she took a role in each of the part.  She

13   used an interstate facility by driving that car.  She paid

14   money.  She took the pictures and continued engaged in that and

15   it was payment to have "Treetop" kill one of the witnesses, or

16   at least one of the witnesses.

17        So I contend there's very strong evidence to establish

18   probable cause.

19        THE COURT:  All right.  It's about ten till --

20        Mr. Swift or Ms. Moreno, do you want, do you want to

21   respond to that or -- it's up to you.

22        MR. SWIFT:  No, Your Honor.

23        THE COURT:  It's ten till noon, seven till by my

24   watch.  Why don't we take a recess and meet back here at 1:30.

25   Would that be --

1          MS. MORENO:  That's fine.

2          THE COURT:  -- okay with everybody?

3          MS. MORENO:  Thank you.

4          THE COURT:  All right.

5          We're in recess till 1:30.

6          COURT SECURITY OFFICER:  All rise.  This Court is now

7     in recess till 1:30.

8        (Lunch recess from 11:52 a.m., until 1:33 p.m.)

9        (Call to Order of the Court)

10         THE COURT:  All right.  The defendant in this case has

11    been charged by way of a criminal complaint.  The allegation

12    contained in that complaint alleges that the defendant violated

13    Title 18 of the U.S. Code § 1958(a), to-wit:  That she did

14    knowingly and intentionally conspire, confederate, agree, and

15    have a tacit understanding with others, known and unknown, to

16    use or cause another to use the mail or any facility of

17    interstate or foreign commerce with the intent that a murder be

18    committed in violation of the laws of any state or the United

19    States as consideration for the receipt of or as consideration

20    for a promise or agreement to pay anything of pecuniary value.

21         I believe that the credible evidence shown today

22    establishes probable cause that each of the essential elements

23    of the offense charged has been made by the Government.

24         With respect to the first element, the use of the

25    interstate, interstate commerce or travel and causing others to

1    use interstate commerce, the evidence was that the defendant

2    operated a motor vehicle to travel to and from Raleigh and

3    Wilmington along our federal interstate highway system to meet

4    with Confidential Source No. 2 and Hysen Sherifi as part of

5    furthering the alleged conspiracy.

6         In addition, the defendant used the telephone with

7    Confidential Source No. 2, Hysen Sherifi, and Shkumbin Sherifi

8    as part of furthering the alleged conspiracy.

9         Additionally, she used the Internet, Twitter, as part

10   of furthering the alleged conspiracy and used the mails

11   providing the screenshot of the witness' address in furtherance

12   of the alleged conspiracy.

13        The second element, intent that a murder be committed

14   in violation of the laws of the United States; in other words,

15   the Court considers what actions by this defendant have been

16   established sufficiently demonstrating the intention of the

17   conspiracy was that a murder be committed.

18        To that end, the evidence was that, the evidence

19   showed communications and meetings between Confidential Source

20   No. 2 in which a photograph of the witness was exchanged.  The

21   confidential source told the defendant that there needed to be

22   confirmation of which witness was to, in fact, be killed.  The

23   defendant's response was, "Okay."  The reasonable inference

24   there is is that she understood.  Confidential Source No. 2

25   asked the defendant whether the defendant had the money to pay

1  for the hit. Defendant said she did, but she did not have

2  permission to provide it at that time and would ask for

3  permission to provide that, which she did so ask and so

4  provide. She paid $750 to CS 2 and advised that Shkumbin

5  Sherifi would provide the rest. We know this because Shkumbin

6  Sherifi told CS 2 when he met CS 2 that, or the communication

7  was that, that this defendant had provided the initial payment.

8          Finally, the testimony was that the defendant herself

9  admitted post <u>Miranda</u> that the, that she knew that as of

10  January the 2nd, 2011 [sic] that the plot was to kill

11  witnesses. The testimony was, also, that there, that the

12  defendant had activities in furtherance of the conspiracy

13  subsequent to January the 2nd.

14          Second, there was testimony that the defendant

15  admitted the plot was to try and assist Mr. Hysen Sherifi and

16  also Subasic.

17          With respect to the consideration element of the

18  underlying charge, the evidence, as I indicated, was that this

19  defendant provided the initial payment in furtherance of the

20  conspiracy of $750.

21          I find based on that evidence that sufficient probable

22  cause has been established and that the case should continue on

23  for prosecution.

24          With respect to detention, the second issue to be

25  decided by the Court today, the issue with respect to detention

1  is whether there is a condition or a combination of conditions

2  that will reasonably assure the appearance of the defendant and

3  the safety of any other person and the community.

4      The factors that this Court must consider in

5  accordance with the Bail Reform Act include the following:

6      (1) The nature and the circumstances of the offense

7  charged, including whether the offense is a crime of violence

8  or involves a narcotic drug;

9      (2) The weight of the evidence against the defendant;

10      (3) The history and character of the defendant,

11  including his or her employment, family and community ties, the

12  defendant's financial resources, the defendant's past conduct,

13  the defendant's history relating to drug and alcohol abuse, the

14  defendant's criminal history, including convictions and prior

15  arrests, the defendant's record concerning appearances at court

16  proceedings in the past, and whether at the time of the offense

17  the defendant was on probation;

18      Finally, the Court should consider the nature and the

19  seriousness of the danger to any person or to the community

20  that would be posed should the defendant be released.

21      In my view, the defendant does not pose a, a danger

22  for the reasons set forth by defense counsel.  I do not believe

23  that the Government has met by clear and convincing evidence

24  that she poses a danger.  The evidence -- the testimony, I

25  believe, was that -- the inference from the testimony was that

1  if, if, if defendant had not met with Hysen Sherifi she would

2  not have been involved in the conspiracy and would not, would

3  not have been involved in the, the facts in this case.

4       So I don't believe the Government's met, met their

5  burden by clear and convincing evidence.

6       With respect to risk of flight, it's a much closer

7  question.  The standard is much lower, preponderance by the

8  evidence, and I believe that the Government has met it with

9  respect to risk of flight.  The, the Court is, is not, is not,

10  is not looking at the defendant's criminal history, whereby

11  the, the Court can simply say, "Well, the defendant's past

12  conduct is a, is a predictor of future behavior.  How has the

13  defendant complied with the court, court directives in the

14  past?"  Typically, in those cases where there are defendants

15  who have a history of probation violations, probation

16  revocations, committing offenses while on probation, courts

17  rely on that to, to say that, "Based on this defendant's past

18  conduct, the Court is not assured that the defendant will

19  comply."

20       In this case, we don't have that.  The defendant is

21  not, according to the Pretrial report, does not have a criminal

22  history.  That is not to say that, that in those cases where a

23  defendant does not have a criminal history that is dispositive

24  that the defendant should be released on conditions.  No.  The

25  Bail Reform Act includes a variety of bases for the Court to

1  consider.

2        In this case, what, what gives this Court great pause

3  is the impetus for flight because of the, because of the

4  punishment that this defendant is facing.  The missing passport

5  and great reluctance to release this defendant under conditions

6  with the simple guarantee that if the passport is found it will

7  be, it will be returned to the Court.

8        Adding to this matrix is the fact that this defendant

9  has extensive travel overseas, extensive connections, access to

10  property, and a family overseas.  Now what this is not saying

11  is that someone with, someone who simply travels

12  internationally dispositively poses a flight risk.  I think

13  that it must be considered in the totality of the

14  circumstances, which this Court faces, and based on that

15  totality I believe that there is a, is a risk of flight, risk

16  of non-appearance of the defendant in this case and for that

17  reason, the defendant should be detained prior to further

18  resolution.

19        Now, Ms. Elshiekh, although I have not found in your

20  favor this afternoon, please understand that you have

21  absolutely every right to appeal my order to the U. S. District

22  Court Judge presiding over this case.  I -- until today, I have

23  not worked with your counsel, Mr. Swift or Ms. Moreno, but

24  everything that they have done before me today with respect to

25  this case indicates to me that they are, they are able and

1    talented counsel.  They have made a good argument in your case

2    and I see no reason that they could not make an effective

3    appeal of my decision, if you choose to do that.  I will take

4    this opportunity to advise you that should you choose to

5    appeal, that you must file a notice of appeal within 14 days of

6    my order.

7           Now while I have entered an oral order just now, I

8    will issue a written order this afternoon and once that written

9    order is issued, it will begin the clock, if you will, by which

10   you must appeal, take the appeal to the District Court.

11          All right.  Is there anything further from the parties

12   with respect to this case?

13          MR. SEVERO:  Nothing from the Government, Your Honor.

14          THE COURT:  Mr. Swift, Ms. Moreno?

15          MR. SWIFT:  No, Your Honor.

16          THE COURT:  All right.  Thank you.

17          COURT SECURITY OFFICER:  All rise.  This United States

18   Court is adjourned.

19          THE COURT:  And Ms. Moreno and Mr. Swift, can I see

20   you for a moment?

21          MR. SWIFT:  Sure thing.

22          -- with the missing passport, should we locate it,

23   would the Court be willing to reconsider?

24          THE COURT:  You'll have to make your argument -- the

25   Bail Reform Act provides for an avenue for appeal and I'll just

1  refer you to the, to 3142.

2          MR. SWIFT:  I just wanted to know if -- I don't want

3  to put appeals that --

4          THE COURT:  I have, I have made, I have made rulings

5  in the past when this issue has come up, obviously in a

6  different context, and found that the better practice is just

7  refer to the parties to the Bail Reform Act 'cause that, that

8  provides for reopening of bail.

9          MR. SWIFT:  Okay.

10          THE COURT:  All right.

11          MR. SWIFT:  Yes, Your Honor.

12          THE COURT:  Come on up.

13     (Bench conference, off the record)

14     (Proceedings concluded at 1:44 p.m.)

15

16                         CERTIFICATE

17          I, court approved transcriber, certify that the

18  foregoing is a correct transcript from the official electronic

19  sound recording of the proceedings in the above-entitled

20  matter.

21  /s/ *Janice Russell*                    March 5, 2012

22  Janice Russell, Transcriber                Date

23

24

25